C. RICHARD HENRIKSEN, JR.
HENRIKSEN & HENRIKSEN, P.C.
320 South 500 East
Salt Lake City, Utah 84102
Telephone:    (801) 521-4145
Facsimile:    (801) 355-0246

LIONEL Z. GLANCY
MICHAEL GOLDBERG
GLANCY & BINKOW LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:    (310) 201-9150
Facsimile:    (310) 201-9160

KENNETH J. CATANZARITE
CATANZARITE LAW CORPORATION
2331 W. Lincoln Avenue
Anaheim, California 92801
Telephone:    (714) 520-5544
Facsimile:    (714) 520-0680

Attorneys for Plaintiff Clifford McQuarrie

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CLIFFORD MCQUARRIE, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> RICHARD D. SIMON and ALBAN A. LANG, <br><br> Defendants. | Case No: **2_02 C V - 1 0 2 8   DB** <br><br> Judge: <br><br> **CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATION OF FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Clifford McQuarrie, by his attorneys, for his Class Action Complaint alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief based upon the investigation of plaintiff's attorneys as to all other matters.  Such

investigation included the thorough review and analysis of public statements, publicly filed

documents of Simon Transportation Services, Inc. ("Simon Transportation" or the "Company")

press releases, news articles and the review and analysis of accounting rules and related literature.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth

below after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1.      This is a securities class action brought on behalf of public investors who

purchased the common stock of Simon Transportation between April 3, 1998 and August 21,

2001 (the "Class Period").

2.      Simon Transportation was a truckload carrier specializing in temperature-

controlled transportation services for major food industry shippers. During the Class Period,

Simon Transportation was able to report revenue increases by under-reserving for accident claims

and other accident-related expenses, as detailed herein.

3.      During the Class Period, defendants engaged in and/or permitted a variety of

financial maneuvers, to temporarily increase Simon Transportation's operating ratios and

profitability to artificially inflate the Company's stock price, including, but not limited to:

        a.      Failing to accrue, contrary to Generally Accepted Accounting Principles

("GAAP"), sufficient insurance reserves for accidents; and

        b.      Misrepresenting Simon Transportation's financial performance by

overstating earnings by under accruing insurance claims.

        c.      Failing to accrue, again contrary to GAAP, operating expenses attributable

1

to revenue booked in each quarter by, among other things, failing to properly accrue an adequate level of insurance reserves associated with accidents

4.      Although cases involving violations of the federal securities laws generally involve manipulations of revenue, as opposed to expenses, defendants here were constrained from manipulating revenue because the Company simply did not have the trucks or the drivers to materially impact revenue, artificially or otherwise. They instead resorted to manipulating the Company's expenses and various accruals related thereto, to artificially boost the Company's stock price.

5.      Operating ratios, the ratio of operating expense to revenue, are a key indicator to Wall Street and the investing public for measuring a transportation company's success. By materially under-reporting expenses throughout the Class Period, defendants were able to significantly decrease their operating ratio and present the illusion of managerial and financial success, resulting in an artificially higher stock price.

6.      Only on August 21, 2001, did defendants disclose that the Company had dramatically increased insurance claims and expenses. Simon Transportation's stock plunged on the same day the Company's insurance problems were disclosed, closing at $3.43 – a 26.43% drop on the August 21, 2001, announcement – damaging plaintiff and the Class.

## JURISDICTION AND VENUE

7.      This action arises under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), §20(A) of the Exchange Act, and §§11, 12(2) and 15 of the Securities Act. The Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§1331 and 1337, §27 of the Securities Exchange Act of 1934 (15 U.S.C. §78aa) (the "Exchange Act"), and §22(a) of the Securities Act of 1933 (15 U.S.C. §77v(a)) (the "Securities Act").

8. Venue is proper in this district pursuant to §27 of the Exchange Act, §22 of the Securities Act and 28 U.S.C. §1391(b). At all times herein mentioned, Simon Transportation's principal place of business was in this district at 5175 West 2100 South, West Valley City, Utah 84120, and the acts alleged herein, including the dissemination of materially false and misleading information, occurred in this District.

9. In connection with the wrongs alleged herein, defendants directly or indirectly used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities, and the facilities of the national securities markets.

## THE PARTIES

10. Plaintiff Clifford McQuarrie purchased shares of Simon Transportation common stock during the Class Period and was damaged thereby.

11. Simon Transportation was a Nevada corporation with headquarters at 5175 West 2100 South, West Valley City, Utah 84120. During the Class Period, Simon Transportation's shares were listed and actively traded on the NASDAQ National Market, an efficient system. Simon Transportation is not named as a defendant herein because the Company filed for bankruptcy protection on February 25, 2002, under Chapter 11 of the United States Bankruptcy Code.

12. The market for Simon Transportation's securities was open, well-developed and

3

efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose the full truth about Simon Transportation and its business, earnings momentum and future prospects, Simon Transportation common stock traded at artificially inflated prices during the entire Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Simon Transportation stock relying upon the integrity of the market price of Simon Transportation stock and market information relating to Simon Transportation, or in the alternative, upon defendants' false and misleading statements, and in ignorance of the adverse, undisclosed information known to defendants, and have been damaged thereby.

13.     Defendant Richard D. Simon ("Simon") was during the Class Period and at relevant times hereto, Chairman, President and Chief Executive Officer of Simon Transportation. Defendant Simon was quoted in and/or responsible for the preparation, approval or release of each statement plaintiff alleges was false and misleading, including all press releases and regulatory filings.  Defendant Simon, by virtue of his positions as an officer and director, was under a continuing duty to direct and control the operations of Simon Transportation, to exercise due care and diligence in those operations, and to oversee and review all corporate operations, including the filing of documents with the SEC and the making of public statements.

14.     Defendant Alban A. Lang ("Lang") was during the Class Period and at relevant times hereto, Treasurer and Chief Financial Officer of Simon Transportation.  Defendant Lang was quoted in and/or responsible for the preparation, approval or release of each statement plaintiff alleges was false and misleading, including all press releases and regulatory filings.  In addition, by virtue of his positions as Treasurer and Chief Financial Officer, Lang was under a

4

continuing duty to direct and control the operations of Simon Transportation, to exercise due care and diligence in those operations, and to oversee and review all corporate operations, including the filing of documents with the SEC and the making of public statements.

15.    By virtue of their positions as officers and/or directors of the Company, defendants Simon and Lang (collectively, the "Individual Defendants") had the authority and ability to and, in fact, controlled the contents of the Company's annual and quarterly reports filed with the SEC and press releases.  Further, the actions of the Individual Defendants during the Class Period caused the material misstatements of the Company's financial condition and results alleged herein.  The Individual Defendants were aware of the contents of the Company's publicly disseminated reports and press releases alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected, but failed to do so.  The Individual Defendants are each liable for the false statements pleaded herein, as those statements were the result of the collective action of the Individual Defendants and thus constitute "group published" information.

16.    As officers, directors and/or controlling persons of a publicly-held company whose common stock is registered with the SEC, traded on the NASDAQ National Market System and governed by provisions of the Exchange Act, defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, markets, management, earnings and present and future business prospects, to correct any previously issued statements from any source that had become untrue, and to disclose any trends that would materially affect earnings and the present and future financial operating results of Simon

5

Transportation, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

17.     It is appropriate to treat defendants as a group for pleading purposes under the federal securities laws and the Federal Rules of Civil Procedure and to presume that the false and misleading information complained of herein was disseminated through the collective actions of all defendants. Defendants were involved in the drafting, producing, reviewing and/or disseminating of the false and misleading information detailed herein, knew or recklessly disregarded that such materially misleading statements were being issued by the Company and/or approved or ratified these statements in violation of the federal securities laws. Defendants' false and misleading statements and omissions of fact consequently had the effect of, both on their own and in the aggregate, artificially inflating the price of the common stock of Simon Transportation during the Class Period.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of all other persons or entities who purchased or acquired Simon Transportation stock during the Class Period and were damaged thereby, excluding the defendants herein, their affiliates and any officers or directors of Simon Transportation or its affiliates, and any members of immediate families and their heirs, successors and assigns (the "Class").

19.     The Class is so numerous that joinder of all the members of the Class is impracticable. Plaintiff believes there are hundreds of record holders of the Company's common

stock located throughout the United States.

20.     Plaintiff's claims are typical of the claims of absent Class members.  Members of the Class have sustained damages arising out of defendants' wrongful conduct in violation of the federal securities laws in the same way as plaintiff sustained damages from the unlawful conduct.

21.     Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel competent and experienced in class and securities litigation.

22.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The Class is numerous and geographically dispersed.  It would be impracticable for each member of the Class to bring a separate action.  The individual damages of any member of the Class may be relatively small when measured against the potential costs of bringing this action, and thus make the expense and burden of this litigation unjustifiable for individual actions.  In this class action, the Court can determine the rights of all members of the Class with judicial economy.  Plaintiff does not anticipate any difficulty in the managing this suit as a class action.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  These questions include, but are not limited to, the following:

            a.     whether defendants' conduct as alleged herein violated the federal securities laws;

            b.     whether the SEC filings, press releases and statements disseminated to the investing public during the Class Period misrepresented Simon Transportation's financial condition

7

and results;

        c.     whether defendants acted knowingly or recklessly in omitting and/or

misrepresenting material facts;

        d.     whether the market price of Simon Transportation common stock during

the Class Period was artificially inflated; and

        e.     whether members of the Class have been damaged and, if so, the proper

measure thereof.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Misleading Statements and Material Omissions During the Class Period

    24.    On July 13, 1998, defendants publicly disseminated a press release, announcing the

Company's third-quarter 1998 fiscal year ("Q3'98") financial results, which states in pertinent part:

**SIMON TRANSPORTATION REPORTS THIRD QUARTER 1998 FISCAL YEAR RESULTS**

SALT LAKE CITY, July 13 /PRNewswire/ -- Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenues and operating results for the third quarter of fiscal 1998 and the nine months ended June 30, 1998.

Revenue for the third quarter increased 22% to $50.1 million, compared with $41.2 million for the corresponding quarter of fiscal 1997. Net loss was ($270,000) or ($.04) per diluted share, compared with net earnings of $3,060,000 or $.48 per diluted share for the corresponding quarter a year ago.

For the first nine months of fiscal 1998, revenue increased 29% to $143.2 million from $111.1 million for the corresponding period of fiscal 1997. Net earnings were $16,000 or $.00 per diluted share, compared with $5,679,000 or $1.01 per diluted share in the 1997 period.

"The month of June represented the turning point of our operation as we continued our trend of record-breaking revenue and resumed operating at a profit," said Chairman,

President and Chief Executive Officer Richard D. Simon. "In order to attract and retain quality drivers, we raised our driver wages again in mid-April to a competitive level. To strengthen our safety, we lowered our truck speed limit, upgraded our driver hiring standards, and expanded the scope and depth of our driver orientation program. In June, we successfully started our own driver school at our corporate headquarters terminal. We also implemented new proprietary dispatch software and restructured our organization to be more efficient and responsive to our customers, drivers and administrative employees. Thanks to our loyal customers, most of the rate revisions proposed have been granted with effective dates between late June and the first half of July. During the quarter, we added 83 trucks and increased the size of our fleet to 1594 trucks as of June 30, 1998. We plan to continue to add trucks to our fleet at the current rate for the balance of this calendar year." Mr. Simon continued.

25.     Defendants knew or recklessly disregarded that the July 13, 1998, press release is

misleading because it fails to disclose the Company's under-accrual for insurance claims. By

under-accruing on probable insurance risks, defendants were able to overstate earnings

throughout the Class Period. By failing to disclose this under-accrual, defendant's artificially

inflated the Company's stock price by portraying the Company more attractively to investors.

26.     Three months later, on October 15, 1998, defendants publicly disseminated a press

release, announcing the Company's fourth quarter 1998 fiscal year ("Q4'98") financial results.

Although acknowledging that "accident claims were another area of concern," defendants failed

to disclose that the Company's insurance coverage was inadequate to cover potential claims. The

October 15, 1998, press release states in pertinent part:

**SIMON TRANSPORTATION REPORTS FOURTH QUARTER AND FISCAL 1998 RESULTS**

SALT LAKE CITY, Oct. 15 /PRNewswire/ -- Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenues and operating results for the fourth quarter and fiscal year ended September 30, 1998.

Revenue for the fourth quarter increased 14% to $50.3 million, compared with $44.2

9

million for the corresponding quarter of fiscal year 1997. Net earnings were $322,000 or $.05 per diluted share, compared with net earnings of $2,099,000 or $.33 per diluted share for the corresponding quarter a year ago.

For the fiscal year ended September 30, 1998, revenue increased 25% to $193.5 million from $155.3 million last year. Net earnings were $338,000 or $.05 per diluted share, compared with $7,779,000 or $1.33 per diluted share last year.

"Earlier this year, Simon Transportation's financial performance was adversely affected by a combination of two driver wage increases that totaled approximately $.04 per mile, an unusual number of severe accidents, and a large number of tractors without drivers. In response, management implemented a broad set of programs designed to strengthen the Company's performance and increase our management depth. We are beginning to see the results of these efforts.

We raised driver wages $.02 per mile in January and another $.02 per mile in April. The wage increases cut our operating margin substantially, but we believe it was necessary to remain competitive in a very tight market for drivers. During the past several months, the Company's sales force has been aggressively seeking rate increases to cover the higher driver wages. Our customer's have responded positively, as revenue per total mile for the fourth quarter improved by approximately $.03 compared with the same quarter last year and by approximately $.02 over the third fiscal quarter of 1998.
Management intends to continue to press for additional rate increases.

Accident claims were another area of concern earlier in the year. Insurance and claims expense had been approximately 2.1% and 2.2% of revenue in fiscal 1996 and 1997, respectively. An unusual occurrence of severe accidents in the second quarter of fiscal 1998 inflated these expenses to 4.1% of revenue for the quarter. We focused on safety issues, strengthened our safety program, and appointed a new safety director. Insurance and claims expense has improved to 2.5% of revenue in the third quarter and 2.1% of revenue for the fourth quarter.                      ***

27.     Defendants knew or recklessly disregarded that the October 15, 1998, press

release is misleading because it fails to disclose the Company's under-accrual for insurance claims.

Even though the press release notes that "we focused on safety issues, strengthened our safety

program, and appointed a new safety director," and that "insurance and claims expense

improved," defendants still failed to disclose the Company's problems concerning its under-accrual of insurance coverage.

28.    On January 15, 1999, defendants continued to mislead investors with a publicly disseminated press release announcing the Company's first-quarter 1999 fiscal year ("Q1'99") financial results, which states in pertinent part:

## SIMON TRANSPORTATION REPORTS FIRST QUARTER 1999 FISCAL YEAR RESULTS

SALT LAKE CITY, Jan. 15 /PRNewswire/ -- Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenues and operating results for the quarter ended December 31, 1998, the Company's first quarter of its 1999 fiscal year.

Revenues for the first quarter increased 13% to $53.0 million, compared with $47.0 million for the corresponding quarter of fiscal year 1998.  Net earnings were $45,000 or $.01 per diluted share, compared with net earnings of $1,864,000 or $.29 per diluted share for the corresponding quarter a year ago.

"Our first fiscal quarter results were hampered by three main factors: too many unseated trucks, lower productivity from the trucks that had drivers, and the fact that rate increases have covered only about half of the four-cent per mile driver pay increase Simon Transportation gave its drivers in 1998," said Chairman, President and Chief Executive Officer Richard D. Simon. Management is aggressively addressing these issues.
                                    * * *

29.    Defendants knew or recklessly disregarded that the January 15, 1999, press release is misleading because it fails to disclose the Company's under-accrual for insurance claims. Although claiming that the Company's results were "hampered by...too many unseated trucks, lower productivity from the trucks that had drivers" and drivers' pay increases that outstripped rate increases, defendants failed to disclose that the Q1'99 results are artificially inflated because the Company's insurance reserves were inadequate. By failing to disclose this under-accrual,

11

defendants artificially inflated the Company's stock price by portraying the Company more attractively to investors.

30.    Three months later, on April 15, 1999, defendants publicly disseminated a press release, announcing the Company's second quarter 1999 fiscal year ("Q2'99") financial results, which states in pertinent part:

## SIMON TRANSPORTATION REPORTS SECOND QUARTER 1999 FISCAL YEAR RESULTS

SALT LAKE CITY, April 15 /PRNewswire/ -- Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenues and operating results for the second quarter of fiscal 1999 and the six months ended March 31, 1999.

Revenues for the second quarter increased 7% to $49.3 million, compared with $46.1 million for the corresponding quarter of fiscal year 1998. Net loss was $1.9 million or 32 cents per diluted share, compared with a net loss of $1.6 million or 25 cents per diluted share for the corresponding quarter a year ago.

For the first six months of fiscal 1999, revenues increased 10% to $102.3 million, compared with $93.2 million for the corresponding period in fiscal 1998. Net loss was $1.9 million or 31 cents per diluted share, compared with net earnings of $0.3 million or 4 cents per diluted share in the fiscal 1998 period.

Chairman, President and Chief Executive Officer Richard D. Simon stated: "Freight demand in January and February was slower than we expected, and our loss for the quarter was attributable to those two months. In March, demand improved. We achieved over 10,000 miles per tractor and were profitable for the month. Simon has recently received commitments from new customers for over $20 million in annual business. We anticipate freight from these accounts to build over the next few months.

Over the past several months, we have focused our efforts on three primary areas in an attempt to restore our profitability: reducing the number of our tractors that do not have drivers, raising freight rates, and improving equipment utilization. We also are cutting costs wherever we can and are reducing our trailer fleet to bring our trailer-to-tractor ratio into better balance with slower tractor growth. Our management team has made progress in these areas. We reduced the average number of tractors without drivers to less than 50 for the quarter, which is a 56% decrease from the immediately preceding quarter and a

66% decrease from the last quarter of fiscal 1998. We have raised freight rates by approximately two cents per mile versus the same periods last year. Despite the progress, we still have a long way to go. We need to raise our rates by another two to three cents per mile and consistently generate 10,000 miles per tractor per month.

***

31.     Defendants knew or recklessly disregarded that the April 15, 1999, press release is misleading because it fails to disclose the Company's under-accrual for insurance claims. In the press release, defendant Simon claims that the Company's business would grow during "the next few months," but fails to disclose that the Company was under-accrued for insurance claims and that effect that under-accrual would have on the Company's revenue and growth.

32.     On July 16, 1999, defendants publicly disseminated a press release, announcing the Company's third-quarter 1999 fiscal year ("Q3'99") financial results, which states in pertinent part:

## SIMON TRANSPORTATION REPORTS THIRD QUARTER 1999 FISCAL YEAR RESULTS

SALT LAKE CITY, July 16 /PRNewswire/ -- Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenues and operating results for the third quarter of fiscal 1999 and the nine months ended June 30, 1999.

Revenues for the third quarter increased 7% to $53.6 million, compared with $50.1 million for the corresponding quarter of fiscal year 1998. Net loss was $0.9 million or 14 cents per diluted share, compared with a net loss of $0.3 million or 4 cents per diluted share for the corresponding quarter a year ago.

For the first nine months of fiscal 1999, revenues increased 9% to $155.9 million, compared with $143.2 million for the corresponding period in fiscal 1998. Net loss was $2.7 million or 45 cents per diluted share, compared with net earnings of $16,500 or 0 cents per diluted share in the fiscal 1998 period.

Chairman, President and Chief Executive Officer Richard D. Simon stated: "We made progress on two of our three primary goals during the quarter. Tractor utilization reached approximately 10,000 miles per month, which is our base goal on an annualized basis.

13

June was especially strong, as the new business developed by our sales department during the past two quarters drove utilization to over 10,000 miles per tractor, the highest level in the past 18 months. We continued to average approximately 50 tractors without drivers while adding 63 incremental tractors to the fleet...."

33.    Defendants knew or recklessly disregarded that the July 16, 1999, press release is misleading because it fails to disclose the Company's under-accrual for insurance claims. By under accruing on probable insurance risks, defendants were able to overstate earnings throughout the Class Period. By failing to disclose this under-accrual, defendants artificially inflated the Company's stock price by portraying the Company more attractively to investors.

34.    On October 15, 1999, defendants publicly disseminated a press release, announcing the Company's fourth quarter ("Q4'99") and 1999 fiscal year financial results, which states in pertinent part:

## SIMON TRANSPORTATION REPORTS FOURTH QUARTER 1999 AND FISCAL YEAR RESULTS

SALT LAKE CITY, Oct. 15 /PRNewswire/ -- Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenue and operating results for the fourth quarter and fiscal year ended September 30, 1999.

Revenue for the fourth quarter increased 6% to $53.3 million, compared with $50.3 million for the corresponding quarter of fiscal year 1998. Net loss was $0.5 million or 8 cents per diluted share, compared with net earnings of $0.3 million or 5 cents per diluted share for the corresponding quarter a year ago.

For fiscal 1999, revenue increased 8% to $209.1 million, compared with $193.5 million for fiscal 1998. Net loss was $3.2 million or 53 cents per diluted share, compared with net earnings of $0.3 million or 5 cents per diluted share in fiscal 1998.

Chairman, President and Chief Executive Officer Richard D. Simon stated: "Our efforts to restore profitability during the quarter were hampered by a dramatic increase in the cost of fuel, which was only partially offset by fuel surcharges. We also experienced lower than expected tractor utilization due mainly to an increased number of tractors without

14

drivers.

***

35.     Defendants knew or recklessly disregarded that the October 15, 1999, press release is misleading because it fails to disclose the Company's under-accrual for insurance claims. While quoting defendant Simon that the Company's "efforts to restore profitability during the quarter were hampered by a dramatic increase in the cost of fuel, [and] lower than expected tractor utilization," the October 15, 1999, press release fails to disclose that the Company was under-accruing on probable insurance risks and the effect of this under-accrual on the Company's revenue results.

36.     Approximately three months later, on January 14, 2000, defendants again failed to disclose problems with the Company's insurance reserves, in a publicly disseminated a press release, announcing the Company's first quarter 2000 fiscal year ("Q1'00") financial results.  The press release quotes defendant Simon, and states in pertinent part:

**Simon Transportation Reports First Quarter Fiscal Year 2000 Results**

SALT LAKE CITY, Jan. 14 /PRNewswire/ -- Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenue and operating results for the quarter ended December 31, 1999, the Company's first quarter of its 2000 fiscal year.

Revenue for the first quarter increased 2% to $53.9 million, compared with $53.0 million for the corresponding quarter of fiscal year 1999.  Net loss was $141,000 or 2 cents per diluted share, compared with net earnings of $45,000 or 1 cent per diluted share for the corresponding quarter a year ago.

Chairman, President and Chief Executive Officer Richard D. Simon stated: "We are beginning to realize the benefits of our efforts to improve customer service, retain our drivers and select more profitable freight.  Our operating ratio has improved 5.7% over the past four quarters.

***

15

37.     On April 12, 2000, defendants publicly disseminated a press release, announcing

the Company's second quarter 2000 fiscal year ("Q2'00") financial results, which states in

pertinent part:

**Simon Transportation Reports Profitable Second Quarter**

SALT LAKE CITY, April 12 /PRNewswire/ -- Simon Transportation Services, Inc.
(Nasdaq: SIMN) announced today financial results for the fiscal second quarter and the six
months ended March 31, 2000.

Revenues for the second quarter increased 12% to $55.2 million, compared to $49.3
million for the second quarter of fiscal year 1999. The Company earned $78,000, or $.01
per diluted share, compared with a net loss of $1.9 million, or ($0.32) per diluted share for
the second quarter of fiscal year 1999.

For the first six months of fiscal 2000, revenues increased 7% to $109.0 million,
compared with $102.3 million for the first six months of fiscal 1999. Net loss was
$63,000, or ($0.01) per diluted share compared with a net loss of $1.9 million, or ($0.31)
per diluted share for the corresponding period of fiscal 1999.

Richard D. Simon, Chairman, President and Chief Executive Officer stated: "Over the
past few months, management has taken aggressive steps in an effort to return the
Company to profitability. We have been able to generate significant results during what is
traditionally the most difficult quarter in the trucking industry. Our sales force has secured
more than $9 million in annualized new business in the first six months of fiscal 2000. In
the month of March, the Company generated record revenue of over $20.4 million."

OPERATING HIGHLIGHTS

-- The Company lowered its operating ratio by 6.5 points compared to the
   same period a year ago.

-- The Company lowered its operating ratio for the fourth consecutive
   quarter.

-- The Company achieved record average length of haul in March 2000, of
   over 1100 miles per load, more than 10% above the averages for the last
   quarter and last year.

16

-- The Company generated 10,533 miles per seated truck in the month of March.

-- The Company had 135 more running trucks in March than it did at the same time last year, and the fleet generated 254 more miles per truck in the month of March than in the same period a year ago.

-- The average number of unseated trucks fell from a high of 154 in November 1999, to 34 in March 2000, the lowest level in over a year.

-- Deadhead miles fell below 10% in March, the lowest level in the history of the Company.

-- The Company improved on-time deliveries throughout the second quarter.

-- Fuel efficiency for the quarter improved by .2 miles per gallon from a year ago, as the Company replaced tractors with newer, more fuel-efficient models.

-- The Company has extended P/L P/D insurance (first million dollars) for two years at the 1999 rate.

-- Pricing on new power equipment and trade residuals has been locked in for the next three years.

-- Pricing on new trailers has been locked in through December 2001.

-- By August 2000, the Company will retire all debt on its last two terminal facilities and will own all Company properties free of debt.

Simon continued: "We recently were successful in reducing our long distance phone rates by over 40%, one part of an on-going campaign to cut costs and overhead expenses. We have continued to emphasize driver retention, and we are actively recruiting new drivers through our Company-sponsored Simon Driving School and other schools. The Company anticipates that the high cost of fuel will be partially offset by its fuel surcharge programs. This is based on the substantial number of customers who have agreed to pay fuel surcharges to offset the escalation in fuel prices. The Company is engaged in the process of re-evaluating rates and adjusting traffic lanes and will be requesting rate increases from customers. We hope to see future improvement in many areas of our operations and will continue to monitor the Company's progress."

17

38.     Defendants knew or recklessly disregarded that the April 12, 2000, press release is misleading because it fails to disclose the Company's under-accrual for insurance claims.   A key indicator in the transportation segment relating to a company's operating success are operating ratios -- the ratio of operating expenses as a percentage of revenue.   The lower the operating margins, the more successful a transportation company is perceived by Wall Street.  The April 12, 2000, press release states that the Company had lowered its operating ratio from the previous year. Defendants, however, could report its superior operating ratios only because defendants manipulated the operating expenses underlying the ratio by under-accruing for the Company's foreseeable insurance risks

39.     On July 21, 2000, defendants continued to overstate Simon Transportation's revenue, by under-accruing for insurance claims, in a publicly disseminated a press release, announcing the Company's third-quarter 2000 fiscal year ("Q3'00") financial results.  The press release states in pertinent part:

**Simon Transportation Reports Third Quarter Fiscal Year 2000 Results**

SALT LAKE CITY, July 21 /PRNewswire/ -- Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenues and operating results for the third quarter of fiscal 2000 and the nine months ended June 30, 2000.

Revenues for the third quarter increased 13.7% to $60.9 million, compared with $53.6 million for the corresponding quarter of fiscal year 1999.  Net loss was $267,000 or 4 cents per diluted share, compared with a net loss of $866,000 or 14 cents per diluted share for the corresponding quarter a year ago.

For the first nine months of fiscal 2000, revenues increased 9.0% to $170.0 million, compared with $155.9 million for the corresponding period in fiscal 1999.  Net loss was $331,000 or 5 cents per diluted share, compared with a net loss of $2.7 million or 45 cents per diluted share in the fiscal 1999 period.

18

Chairman and Chief Executive Officer Richard D. Simon stated: "The cost of fuel continued to hamper our efforts to maintain profitability. Our fuel costs have increased 35% compared to the same quarter of our prior fiscal year. Although many of our customers have agreed to share this burden with us in the form of fuel surcharge agreements, our unrecovered portion of the increased fuel cost was approximately $1.2 million, or 12 cents per diluted share for the quarter ended June 30, 2000. Results of operations for the quarter also reflected unanticipated expenses associated with the Company's response to a shareholder tender offer and consent solicitation. On June 30, 2000, the tender offer expired and the consent solicitation was withdrawn."

40.     Defendants knew or recklessly disregarded that the July 21, 2000, press release is misleading because it fails to disclose the Company's under-accrual for insurance claims. By under-accruing on probable insurance risks, defendants were able to overstate earnings throughout the Class Period and portray the Company more attractively to investors.

41.     On December 14, 2000, defendants publicly disseminated a press release, announcing the Company's fourth quarter 2000 fiscal year ("Q4'00") financial results, which again fails to disclose problems with the Company's insurance reserves. The press release states in pertinent part:

**Simon Transportation Reports Fourth Quarter 2000 and Fiscal Year Results**

SALT LAKE CITY, Dec. 14 /PRNewswire/ -- Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenue and operating results for the fourth quarter and fiscal year ended September 30, 2000.

Revenue for the fourth quarter increased 15.3% to $61.4 million, compared with $53.3 million for the corresponding quarter of fiscal year 1999. Net loss was $6.9 million or $1.13 per diluted share, compared with net loss of $0.5 million or 8 cents per diluted share for the corresponding quarter a year ago.

For fiscal 2000, revenue increased 10.6% to $231.4 million, compared with $209.1 million for fiscal 1999. Net loss was $11.1 million or $1.82 cents per diluted share, compared with net loss of $3.2 million or 53 cents per diluted share in fiscal 1999.

During the quarter, Jerry Moyes acquired a controlling interest in Simon Transportation. As part of this change in ownership and management, the Company adopted an actuarial method of accounting for accident and workers' compensation claims in place of its former method. Both methods are acceptable under generally accepted accounting principles. Using the new method resulted in increased charges for accident and workers' compensation claims, including a one-time charge related to the change of $3.9 million.

***

42.    Simon Transportation's Form 10-K, filed January 12, 2001, with the SEC,

discusses the Company's liability insurance coverage. The 10-K states in pertinent part:

Safety and Insurance

Simon Transportation emphasizes safety in all aspects of its operations. Its safety program includes: (I) initial orientation; (ii) a three-week to six-week, on-the-road training program; and (iii) progressive penalties for excessive speed and log violations. The Company has earned the highest DOT safety and fitness rating of "satisfactory," which most recently was extended on July 6, 2000.

**The Company carries primary and excess liability insurance coverage of $50 million, with a $250,000 basket deductible for personal injury and property damage. The Company's workers' compensation coverage also carries a $350,000 deductible, with no coverage limit. Management believes these coverages are adequate to cover reasonably anticipated claims.**

***

Insurance Coverage and Accrued Claims Payable

The Company estimates and accrues a liability for its share of ultimate settlements using all available information, including the services of a third-party risk administrator, to assist in establishing reserve levels for each occurrence based on the facts and circumstances of the occurrence coupled with the Company's past history of such claims. The Company provides for adverse loss developments in the period when new information so dictates.

43.    Defendants knew or recklessly disregarded that the Company's insurance

coverage, as specified in the January 21, 2001, 10-K, was not sufficient to cover potential claims.

20

By failing to disclose this fact, defendants continued to artificially inflate the price of the

Company's stock

     44.     On February 14, 2001, defendants continued to misrepresent Simon

Transportation's financial performance, overstating earnings by under-accruing insurance claims.

Defendants publicly disseminated a press release, announcing the Company's first quarter 2001

fiscal year ("Q1'01") financial results, including a 21% percent increase in revenue.  The press

release states in pertinent part:

**Simon Transportation Reports First Quarter 2001 Results**

   SALT LAKE CITY, Feb. 14 /PRNewswire/ -- Simon Transportation Services Inc.
(Nasdaq: SIMN) announced today revenue and operating results for the first quarter of its
fiscal year.

   Revenue for the first quarter increased 21.6% to $65.5 million, compared with $53.9
million for the corresponding quarter of fiscal year 2000. Approximately 31% of the
additional revenue was represented by fuel surcharges. Net loss was $3.0 million, or $0.49
per diluted share, compared with net loss of $0.1 million, or $0.02 cents per diluted share,
for the corresponding quarter a year ago.

   The main factors affecting Simon's results were lower miles per tractor and increased
recruiting, claims, and repair costs associated with high driver turnover. The turnover
resulted in a large number of tractors without drivers during the quarter. Decreased freight
demand because of slowing economy also impacted the company's revenue base. In
addition, high fuel prices that were not fully recovered through fuel surcharges and a
previously announced driver wage increase on November 1, 2000, increased Simon's
expenses.

   The company's insurance and claims expense during the 2000 quarter was significantly
higher than in the corresponding period of 1999 in part because of a change in accounting
method adopted during the fiscal quarter ended September 30, 2000. The company
adopted an actuarial method of accounting for accident and workers' compensation claims.

   In January 2001, Simon completed the acquisition of a portion of the trucking assets of
Westway Express, Inc. Simon added approximately 235 company-owned tractors and 50

tractors supplied by owner-operators in the transaction.

***

Our people are working hard to improve Simon's operations. However, in the near term, we expect soft freight demand, high fuel prices, and unseated tractors to continue to affect our financial results."

45.    Defendants knew or recklessly disregarded that the February 14, 2001, press release is misleading because it fails to disclose the Company's under-accrual for insurance claims and the effect of this under-accrual on the Company's revenue.

46.    On May 21, 2001, defendants publicly disseminated a press release, announcing the Company's second quarter 2001 fiscal year ("Q2'01") financial results, which states in pertinent part:

**Simon Transportation Reports Second Quarter 2001 Results**

SALT LAKE CITY, May 21 /PRNewswire/ -- Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenue and operating results for the second quarter of fiscal 2001 and the six months ended March 31, 2001.

Revenue for the second quarter increased 16.1% to $64.1 million, compared with $55.2 million for the corresponding quarter of fiscal year 2000. Net loss was $8.8 million, or $1.44 per diluted share, compared with net earnings of $78,000, or $0.01 cents per diluted share, for the corresponding quarter a year ago.

For the first six months of fiscal 2001, revenue increased 18.9% to $129.6 million compared with $109.0 million for the corresponding period in fiscal 2000. Net loss was $11.8 million, or $1.93 per diluted share, compared with a net loss of $63,000, or $0.01 per diluted share in the fiscal 2000 period.

Tightening economic conditions continue to place extreme pressure on the transportation industry.  Soft freight demand, increased empty miles, high fuel costs, and increased operating costs related to driver wages and acquisitions combine to create the most challenging period in the Company's history.

Chief Executive Officer Jon Isaacson stated, "We are aggressively working to improve service to our customers.  To provide our customers with premium service, we eliminated

22

our remaining non-refrigerated vans and replaced them with new temperature-controlled trailers. This resulted in a one-time charge of approximately $500,000. Effective April 1, 2001, we increased our driver pay to attract and retain the best experienced drivers. This is our second increase in five months and places our pay package among the top of the industry. Many of our customers have responded to this pay increase through increased freight rates. The pay increase should reduce our dependence on drivers new to the industry. As a result, we closed our in-house driving school.

***

47.    Defendants knew or recklessly disregarded that the May 21, 2001, press release is misleading because it fails to disclose the Company's under-accrual for insurance claims. By under-accruing on probable insurance risks, defendants were able to overstate earnings throughout the Class Period. By failing to disclose this under-accrual, defendants artificially inflated the Company's stock price by portraying the Company more attractively to investors.

48.    Approximately three months later, on August 20, 2001, the Company filed its Form 10-Q for third quarter fiscal year 2001 ("Q3'01") with the SEC. The Form 10-Q states the following with respect to the Company's increased insurance costs:

> Insurance and claims increased $2.8 million (145.6%) to $4.7 million during the quarter ended June 30, 2001, from $1.9 million for the corresponding period of 2000. As a percentage of revenue, insurance and claims increased to6.3% of revenue for the three months ended June 30, 2001, from 3.2% for the corresponding period of 2000.

49.    Defendants knew or recklessly disregarded that the Form 10-Q is misleading. Simon Transportation's reported insurance expenses increased dramatically during the Class Period, however, defendants failed to disclose that the true cause of the insurance increase for Q3'01 was a severe under-accrual of liabilities.

50.    The next day, August 21, 2001, defendants publicly disseminated a press release

23

announcing the Company's third quarter 2001 fiscal year financial results. The press release

discloses that the cost of insurance and claims for the six months ended June 30, 2001, more than

doubled -- from $4,937,940 for the first six months of 2000, to $11,937,846 for the same period

in 2001. The press release states in part:

### Simon Transportation Reports Fiscal Third Quarter 2001 Results and Equity Investment by Moyes Partnership

SALT LAKE CITY, Aug. 21 /PRNewswire/ -- Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenue and operating results for the third quarter of fiscal 2001 and the nine months ended June 30, 2001.

Revenue for the third quarter increased 22.6% to $74.7 million, compared with $60.9 million for the corresponding quarter of fiscal year 2000. Net loss was $9.5 million, or $1.56 per diluted share, compared with a net loss of $267,000, or $0.04 cents per diluted share, for the corresponding quarter a year ago.

For the first nine months of fiscal 2001, revenue increased 20.2% to $204.3 million compared with $170.0 million for the corresponding period in fiscal 2000. Net loss was $21.3 million, or $3.49 per diluted share, compared with a net loss of $331,000, or $0.05 per diluted share in the fiscal 2000 period.

Chief Executive Officer Jon Isaacson stated, "The Company's financial results were impacted significantly by high fuel costs, increased insurance and claims expense, and soft freight demand. The soft freight demand contributed to poor equipment utilization, increased empty miles, and an inability to raise freight rates.

***

51.    On the same day, August 21, 2001, and the last day of the Class Period, investors

reacted negatively to the news of the significant jump in the cost of the Company's insurance

claims. The Company's stock price plummeted from $4.60 to $3.43 in one day, losing more than

25% of value from the previous day's close.

52.    Approximately six months later, in February 2002, Simon Transportation filed for

24

bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code.

53.     Two months later, an article published April 8, 2002, in the <u>Wall Street Journal</u>

described the effect of the Simon Transportation's insurance problems on the Company's balance

sheet.  The <u>Wall Street Journal</u> article states in part:

Adding to Simon's woes were truck-accident suits filed against it before [Jerry] Moyes
took control of it, according to Gordon Holladay, a Simon board member and chief
financial officer of SME Steel Contractors, a Salt Lake City concern that is 95% owned by
Mr. Moyes.  Those lawsuits bruised Simon's balance sheet by forcing it to pay a $1 million
deductible and double the reserves set aside for such insurance losses, Mr. Holladay said.

"[Moyes] took the business over, believing that he could fix a lot of the problems," he
said."As it turns out, there were more skeletons in the closet than one could ever
determine looking in from the outside."

## Defendants' Manipulation of the Financial Statements

54.     In order to artificially inflate the price of Simon Transportation's stock, defendants

caused the Company to falsely report its financial results and manipulate its operating ratio during

the Class Period.  Defendants did this by, <u>inter alia</u>, failing to accrue adequately for the increasing

costs of accidents, which led to a material overstatement of revenue, net income and EPS for each

quarter during the Class Period.

55.     Reporting financial results which were materially overstated, Simon Transportation

was able to meet its own and analysts' forecasts for EPS growth.

56.     The false financial results complained of herein were released to the investing

community in the form of press releases, as well as included in submissions to the SEC on Forms

S-1, 10-Q and 10-K.  The Form 10-Q's, signed by defendant Lang, additionally represented that

the accompanying financial statements included all adjustments "necessary for a fair presentation

of the financial condition and results for the interim periods."

57.    Defendants' representations regarding Simon Transportation's financial results during the Class Period were false and misleading when made, and were not a "fair presentation" of Simon Transportation's results and were presented in violation of GAAP and SEC rules.

58.    GAAP are those principles recognized by the accounting profession as the rules, conventions and practices recognized and employed by the accounting profession for the preparation of financial statements.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) requires that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  The Financial Accounting Standards Board ("FASB") in its Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements in Business Enterprises, in paragraph 86, states that:

> Consumption of economic benefits during a period may be recognized
> either directly or by relating it to revenues recognized during the period
> [APB Opinion 29]:
>                      (1)    Some expenses, such as cost of goods sold are
> matched with revenues -- they are recognized upon recognition of revenues that result
> directly and jointly from the same transactions or other events as the expenses.

59.    GAAP requires that a business enterprise match the appropriate expenses in the period in which the revenue related to those expenses is recorded.  FASB Statement of Concepts No. 6 states in paragraph 145:

> Accrual accounting used as accrual, deferral and allocation procedures whose goal
> is to relate revenues, expenses, gains, and losses to periods to reflect an entity's
> performance during a period instead of merely listing its cash receipts and outlays.
> Thus, recognition of revenues, expenses, gains, and losses and the related

increments or decrements in assets and liabilities -- including matching of cost and revenues, allocation, and amortization -- is the essence of using accrual accounting to measure performance of entities.

60.    The goal of accrual accounting is to recognize the effects of transactions and other events on the financial condition of the enterprise in the appropriate periods in which they occur. Matching costs and revenues should be simultaneous in the various periods to jointly reflect the economic benefit or decrement of the transactions or other events occurring in the enterprise.

61.    Defendants caused Simon Transportation to falsify its reported financial results by failing to properly accrue an adequate level of insurance reserves associated with accidents. Defendants further failed to record appropriate Operating Supplies and Expense amounts throughout the Class Period, instead concealing and deferring such amounts until they could no longer be concealed.

62.    Pursuant to GAAP, Simon Transportation should have appropriately matched all of the aforementioned expenses in the same periods as the associated revenues were incurred throughout the Class Period. This would have produced a sharply lower earnings growth and would have, or could have, prevented investors from relying on the inflated financial statements disseminated publicly by Simon Transportation. Instead, Simon Transportation failed to adequately accrue for these expenses, or deferred the expenses until the Company could no longer hide them, and then ultimately reported the anticipated loss for the second quarter of fiscal 1998.

63.    FASB Statement of Concepts No. 5, Accounting for Contingencies, requires that when a loss (or an expense) is both probable and subject to estimation, that the liability should be recorded in the financial statements in the period when the loss/liability is determined. FASB

Statement of Concepts No. 5 states at paragraph eight:

> An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:
>
> a.    Information available prior to the issuance of the financial statement indicates that it is probable that an asset has been impaired or a liability has been incurred; and
>
> b.    The amount of the loss can be reasonably estimated.

64.    Due to these accounting improprieties, Simon Transportation presented its financial results and statements in a manner which violated GAAP, and hence Regulation S-X, including violating the following fundamental accounting principles:

a.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

b.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

c.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wide responsibilities for accountability to prospective investors and to the public in general (FASB

Statement Concepts No. 1, ¶50);

       d.     The principle that financial reporting should provide information about an enterprise's financial performance during a certain time period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

       e.     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. ¶¶58-59);

       f.     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79);

       g.     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97); and

       h.     The principle that revenue must be realizable (collectible) and earned prior to recognition was violated (FASB Statement of Concepts No. 5, ¶83).

      65.    The undisclosed adverse information concealed by defendants during the Class

Period is the type of information which, because of SEC regulations, NASDAQ regulations and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be, and must be, disclosed.

## DEFENDANTS' SCIENTER

66.   Defendants' false representations and material omissions were made with scienter in that defendants (1) knew or recklessly disregarded that the public documents and statements issued or disseminated by Simon Transportation were materially false and misleading as described above; (2) knew or were reckless in not knowing that the false financial results would be issued or disseminated to the investing public; and (3) knowingly and substantially participated in the preparation and/or issuance or dissemination of such statements or documents during the Class Period.

67.   During the Class Period, each Individual Defendant was provided with copies of Simon Transportation's management reports, press releases and SEC filings alleged herein to be misleading prior to, or shortly after issuance.  Each Individual Defendant also knew that the Company's sophisticated data tracking system provided instantaneous access to pertinent revenue data.  Each Individual Defendant, moreover, had the ability and opportunity to prevent issuance of the materially misleading press releases and/or SEC filings, or cause them to be corrected.  As a result, each Individual Defendant is responsible for the accuracy of the public reports and releases detailed herein as "group published" information and are therefore responsible and liable for the representations contained therein.

68.    Defendants are liable, jointly and severally, as direct participants in the wrongs complained of herein.  Defendants had a duty to promptly disseminate accurate and truthful information with respect to Simon Transportation's operations, financial condition and future business prospects or to cause and direct that such information be disseminated so that the market price of Simon Transportation stock would be based on truthful and accurate information.

69.    Each defendant further had the requisite motive and opportunity to commit the acts alleged herein.  By virtue of their positions with Simon Transportation and because of the significant reputational and monetary benefits they stood to gain from a positive public perception of Simon Transportation, and as a result of artificially inflated stock prices, defendants had both the motive and opportunity to commit the acts alleged herein.

70.    Each Individual Defendant also had the opportunity to commit and participate in the fraud.  Each Individual Defendant was a senior officer of Simon Transportation, and controlled press releases, corporate reports, communications with analysts, public filings, and the reporting of the Company's financial information.  The Individual Defendants thus controlled public dissemination of Simon Transportation's false and misleading statements to the investing public, as alleged herein, which misleading statements operated to artificially inflate the price of Simon Transportation's stock during the Class Period.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

71.    The statutory safe harbor relating to forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the statements pleaded herein were not specifically identified as "forward-looking

31

statements" when made.  To the extent there were any forward looking statements, there were no

meaningful cautionary statements identifying the important then-present factors that could and did

cause actual results to differ materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking

statements pleaded herein, defendants are liable for those false forward-looking statements

because at the time each of those forward-looking statements was made, the particular speaker

knew that the particular forward-looking statement was false or misleading, and/or the forward-

looking statement was authorized and/or approved by an executive officer of Simon

Transportation who knew that those statements were false when made.

72.    Any warnings contained in the press releases and the financial statements quoted

herein were generic statements of the kind of risks that affect any transportation company and

misleadingly contained no specific factual disclosure of any specific problems with Simon

Transportation which placed the Company's profitability and growth at risk.

**COUNT I**

**BREACH OF FIDUCIARY DUTY**
**AGAINST ALL DEFENDANTS**

73.    Plaintiff repeats and realleges each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

74.     Defendants owed a fiduciary duty to the Class as purchasers and owners of Simon stock.

75.     Defendants, by means of their making the foregoing false and misleading statements, breached their fiduciary duty to the Class.

## COUNT II

### VIOLATIONS OF §10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

76.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.     At all relevant times, the defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct whereby they knowingly and/or recklessly made and/or failed to correct public representations which were or had become materially false and misleading regarding Simon Transportation's financial results and operations. This continuous course of conduct resulted in the defendants causing Simon Transportation to publish public statements which they knew, or were reckless in not knowing, were materially false and misleading, in order to artificially inflate the market price of Simon Transportation stock and which operated as a fraud and deceit upon members of the Class.

78.     Defendants are liable as direct participants in and as controlling persons of the wrongs complained of herein.  By virtue of their positions of control and authority as officers and directors of Simon Transportation, the Individual Defendants were able to and did, directly or

33

indirectly, control the content of the aforesaid statements relating to the Company, and/or the failure to correct those statements in a timely fashion once they knew or were reckless in not knowing that those statements were no longer true or accurate. The Individual Defendants caused or controlled the preparation and/or issuance of public statements and the failure to correct such public statements containing misstatements and omissions of material facts as alleged herein.

79.     The Individual Defendants had actual knowledge of the facts making the material statements false and misleading, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though same were available to them.

80.     In ignorance of the adverse facts concerning Simon Transportation's business operations and earnings, and in reliance on the integrity of the market, plaintiff and the Class acquired Simon Transportation common stock at artificially inflated prices and were damaged thereby.

81.     Had plaintiff and the Class known of the materially adverse information not disclosed by defendants, they would not have purchased Simon Transportation common stock, or at least not at the inflated prices paid.

82.     By virtue of the foregoing, defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

## COUNT III

### VIOLATION OF §20(a) OF THE EXCHANGE ACT
### AGAINST THE INDIVIDUAL DEFENDANTS

83.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84.     This count is asserted against the Individual Defendants and is based upon Section 20(a) of the 1934 Act.

85.     The Individual Defendants, by virtue of their offices, directorships, stock ownership and specific acts were, at the time of the wrongs alleged herein and as set forth in Count I, controlling persons of Simon Transportation within the meaning of Section 20(a) of the 1934 Act. The Individual Defendants had the power and influence and exercised the same to cause Simon Transportation to engage in the illegal conduct and practices complained of herein by causing the Company to disseminate the false and misleading information referred to above. Moreover, the Individual Defendants owned or controlled substantial amounts of the Company's stock.

86.     The Individual Defendants' respective positions made them privy to and provided them with actual knowledge of the material facts concealed from plaintiff and the Class.

87.     By virtue of the conduct alleged in Count II, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to plaintiff and the Class for damages suffered.

## **PRAYER FOR RELIEF**

**WHEREFORE,** plaintiff demands judgment:

1.     Determining that the instant action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

2.     Awarding compensatory damages and/or rescission as appropriate against

35

defendants, in favor of plaintiff and all members of the Class for damages sustained as a result of defendants' wrongdoing;

      3.    Awarding plaintiff and the Class the costs and disbursements of this suit, including reasonable attorneys', accountants' and experts' fees; and

      4.    Awarding such other and further relief as the Court may deem just and proper, including imposition of a constructive trust upon the proceeds of defendants' insider trading, pursuant to Fed. R. Civ. Proc., Rules 64 and 65.

Dated: September 13, 2002          HENRIKSEN & HENRIKSEN, P.C.

                       By                     
                           C. Richard Henriksen, Jr.

                       320 South 500 East
                       Salt Lake City, Utah  84102
                       Telephone:   (801) 521-4145
                       Facsimile:   (801) 355-0246

                       Lionel Z. Glancy
                       Michael Goldberg
                       GLANCY & BINKOW LLP
                       1801 Avenue of the Stars, Suite 311
                       Los Angeles, California  90067
                       Phone:       (310) 201-9150
                       Facsimile:   (310) 201-9160

                       Kenneth J. Catanzarite
                       CATANZARITE LAW CORPORATION
                       2331 W. Lincoln Avenue
                       Anaheim, California 92801
                       Telephone:   (714) 520-5544
                       Facsimile:   (714) 520-0680

Kwasi Asiedu
LAW OFFICES OF KWASI ASIEDU
3858 Carson Street #204
Torrance, California 90503
Telephone: (310) 792-3948

**Attorneys for Plaintiff**

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 13, 2002

HENRIKSEN & HENRIKSEN, P.C.

By _____

C. Richard Henriksen, Jr.

320 South 500 East
Salt Lake City, Utah  84102
Telephone:     (801) 521-4145
Facsimile:     (801) 355-0246

Lionel Z. Glancy
Michael Goldberg
GLANCY & BINKOW LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California  90067
Telephone:     (310) 201-9150
Facsimile:     (310) 201-9160

Kenneth J. Catanzarite
CATANZARITE LAW CORPORATION
2331 W. Lincoln Avenue
Anaheim, California 92801
Telephone:     (714) 520-5544
Facsimile:     (714) 520-0680

Kwasi Asiedu
LAW OFFICES OF KWASI ASIEDU
3858 Carson Street #204
Torrance, California 90503
Telephone:     (310) 792-3948

**Attorneys for Plaintiff**

**START CERTIFICATION**

**GLANCY & BINKOW LLP**
**SWORN CERTIFICATION OF PLAINTIFF CLIFFORD MCQUARRIE**
**SIMON TRANSPORTATION SERVICES, INC. SECURITIES LITIGATION**

I, Clifford McQuarrie, certify that:

1.   I have reviewed the Complaint and authorized its filing.

2.   I did not purchase SIMON TRANSPORTATION SERVICES, INC., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.   My transactions in SIMON TRANSPORTATION SERVICES, INC. during the Class Period set forth in the Complaint are as follows:

I bought _____ shares on ___/___/___ at $ ____ per share     *I also bought shares*
I bought _____ shares on ___/___/___ at $ ____ per share     *all of the year of*
I bought _____ shares on ___/___/___ at $ ____ per share     *1998.*
I bought _____ shares on ___/___/___ at $ ____ per share

I sold _____ shares on ___/___/___ at $ ____ per share
I sold _____ shares on ___/___/___ at $ ____ per share
I sold _____ shares on ___/___/___ at $ ____ per share
I sold _____ shares on ___/___/___ at $ ____ per share

**(List Additional Transactions On Separate Page If Necessary)**

5.   I have not served as a representative party on behalf of a class under this title during the last three years.

6.   I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

_____
**(Please Sign Your Name Above)**

Dated: __8-26-02__

**END CERTIFICATION**

**FAX THIS DOCUMENT BACK TO (310) 201-9160**
**AND BY US MAIL**
