C. RICHARD HENRIKSEN, JR., #1466
HENRIKSEN & HENRIKSEN, P.C.
320 South 500 East
Salt Lake City, Utah  84102
Telephone:     (801) 521-4145
Facsimile:     (801) 355-0246

Plaintiff's Liaison Counsel

LIONEL Z. GLANCY
MICHAEL GOLDBERG
GLANCY & BINKOW LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California  90067
Telephone:     (310) 201-9150
Facsimile:     (310) 201-9160

KENNETH J. CATANZARITE
CATANZARITE LAW CORPORATION
2331 W. Lincoln Avenue
Anaheim, California 92801
Telephone:     (714) 520-5544
Facsimile:     (714) 520-0680

Attorneys for Lead Plaintiff Clifford McQuarrie, and the Class



## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CLIFFORD MCQUARRIE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD D. SIMON and ALBAN B. LANG,<br><br>Defendants. | Case No: 2:02CV1028<br><br>Judge: Honorable Dee Benson<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff, Clifford McQuarrie, individually and on behalf of all persons similarly

situated, by and through his attorneys, for his Amended Class Action Complaint alleges the

following upon personal knowledge as to himself and his own acts, and upon information and

belief based upon the investigation of Plaintiff's attorneys as to all other matters.  Such

investigation included the thorough review and analysis of public statements, publicly filed

documents of  Simon Transportation Services, Inc. ("Simon Transportation" or the "Company")

press releases, news articles, the review and analysis of accounting rules and related literature,

and the review of the bankruptcy record for the Company.  Plaintiff believes that further

substantial evidentiary support will exist for the allegations set forth below after a reasonable

opportunity for discovery.

## SUMMARY OF ACTION

1.      This is a securities action alleging violations of the Securities Act of 1933 and the

Securities Exchange Act of 1934.  This action is brought as a class action, to recover damages

caused by the Defendants' violations of federal securities laws, on behalf of all persons, other

than Defendants, who purchased, sold, or otherwise acquired or disposed of the common stock of

Simon Transportation (not a defendant in this action) between July 13, 1998 and January 14,

2002 (the "class period").

2.      While many securities cases involve the overstatement of a Company's revenues,

this case involves the under-reporting of Simon Transportation's expenses and liabilities as well

the misrepresentation of the Company's safety and training policies.  During the class period,

Defendants artificially inflated the Company's stock price by recklessly under reporting accident

related expenses and liabilities; misrepresenting its training and safety practices for drivers; and

failing to disclose that the Company had a $126.1 million loss exposure for guaranteed residual

lease values on its leased tractors and trailers (a potential loss exposure that exceeded the total value of all assets held by the Company at the end of fiscal 2000).

3.      Simon Transportation, which filed for bankruptcy in February 2002, was a holding company with the sole business of holding 100% of the capital stock of Dick Simon Trucking, Inc,[1] a trucking company that specialized in refrigerated transportation services for major food industry shippers.  The Company's fiscal year end occurs on September 30 of each year.

4.      Like any business, Simon Transportation incurred liability for the acts of its employees during the course of their employment.  Because the nature of Simon Transportation's business was transporting goods, it incurred exposure to liability from accidents involving its truck drivers.  As a result, a large cost of business for Simon Transportation was the expense and related liabilities arising from these employee-related accidents.  It is the improper under-reporting of its actual accident related expenses and liabilities that artificially inflated the price of the Company's stock and injured Plaintiff and the Class.

5.      By under-reporting its accident related expenses and liabilities, the Company was able to inflate its earnings and understate its losses, throughout the class period.  This, in turn, allowed the Company to artificially improve its Operating Ratio, a key metric used by investors and analysts to evaluate the financial performance of the Company.

6.      Simon Transportation's practice of under reporting its accident expenses and

---

[1]

References to "the Company" or "Simon Transportation" includes the consolidated operations of Simon Transportation Services and Dick Simon Trucking.

2

liability was revealed in January 2001, when the Company, in its annual report for fiscal 2000, disclosed a $6 million increase in its accident related liability from <u>prior</u> accounting periods, which the Company attributed to a change in accounting method.  This caused the Company's insurance and claims expense to balloon in the fourth quarter of fiscal 2000 to $11.6 million[2] from $1.9 million in the prior quarter. The Company's  total insurance and claims expense for fiscal 2000 increased to $16.5 million, from a $5.6 million expense in fiscal 1999.  Furthermore, the Company's accident liability was increased to $8.9 million in the fourth quarter of fiscal 2000, from $2.0 million reported in the previous quarter.   This dramatic increase in insurance and claims expense and accident liability was effectively a restatement of past insurance expenses and liabilities reported by the Company.  The magnitude of the  restatement demonstrates that Defendants recklessly under-reported the Company's insurance and claims expenses and accident liabilities in prior periods.

7.     Moreover, the Company later admitted that the restatement was the result of the prior management having under reported the Company's true expenses and liability for past accidents, when a member of the Company's board of directors admitted in a <u>Wall Street Journal</u>, article, published in April 2002, that the Company had under-reported its true accident related costs from prior periods.  The article stated, in pertinent part:

> Adding to Simon's woes were truck-accident suits filed against it before Mr. Moyes [a well known trucking executive who took control of the Company from defendant Richard

---

2

This figure includes the $ 6.1 million gross amount the company used to increase its accident liability as well as the $5.5 million in insurance and claims expense the Company had incurred solely in the fiscal fourth quarter.

3

Simon in September of 2000] took control of it, according to Gordon Holladay, a Simon board member and chief financial officer of SME Steel Contractors, a Salt Lake City concern that is 95% owned by Mr. Moyes.  <u>Those lawsuits bruised Simon's balance sheet by forcing it to pay a $1 million deductible and double the reserves set aside for such insurance losses,</u> Mr. Holladay said. (emphasis added)

Mr Holladay went on to state:

"[Moyes] took [Simon Transportation] over, believing that he could fix a lot of the problems....As it turns out, there were <u>more skeletons in the closet than one could ever determine looking in from the outside</u>." (emphasis added)

8.      Once the Company began to properly account for its accident expenses, the

Company's insurance and claims expense for the remainder of the class period was dramatically

effected, as shown by the following table:

|  | Q1 2000 | Q2 2000 | Q3 2000 | Q4 2000 | Q1 2001 | Q2 2001 | Q3 2001 | Q4 2001 | Q1 2002 |
|---|---|---|---|---|---|---|---|---|---|
| INSURANCE AND CLAIMS EXPENSE | $1.4 M | $1.6 M | $1.9 M | $11.6 M | $3.5 M | $3.7 M | $4.7 M | $4.8 M | $6.4 M |

Source: Simon Transportation's SEC filings

9.      In addition, during the class period, Defendants misrepresented the Company's

safety and training policies for its drivers, making it impossible for investors to recognize the risk

to the Company from increased accidents, liability, expense, and lawsuits that poorly trained

drivers and unsafe policies would cause.

10.      The Company repeatedly stated in its annual reports filed with the SEC that it

emphasized driver safety and provided adequate training for its drivers.  However, the Company,

and the industry as a whole, was facing a severe driver shortage of about 80,000 drivers during

the class period.  Due to the shortage of drivers, the Company compromised its safety and

4

training policies by hiring unsafe drivers and failing to adequately train them.

11.     This compromise of the Company's safety and training policies did not begin emerge until Michael Bowers, a Simon Transportation driver, crashed his truck into the California state Capitol Building killing himself in the process.

12.     In the fallout from the crash, the Company admitted that Bowers only received a maximum of thirteen days of on-the-road training even though the Company had maintained that it offered a minimum of three weeks of on-the-road training. Furthermore, according to a former manager of Simon Transportation, it was revealed that the Company would often terminate a driver because of poor driving habits only to rehire that driver a short time later due to driver shortages. Moreover, according to former employees of Simon Transportation, the Company would hire drivers that  the Company's own trainers recommended should not be hired because the trainee was unsafe. In fact, Bowers was hired over the objections his trainer.

13.     As a result of the Company's material misrepresentations concerning its safety and training policies, the Company's stock was artificially inflated, thereby damaging investors.

14.     Finally, throughout the class period, the Company recklessly failed to disclose in its SEC filings that the Company had guaranteed to its lessors $126.1 million in residual value of all its leased tractors and trailers. This caused the Company to be subject to substantially greater exposure to loss and risk than its SEC filings indicated; a loss exposure that far exceeded the total of all assets held by the Company in fiscal 2000.

15.     Simon Transportation leased most of the tractors and trailers it used in its

5

operations.  Upon termination of a lease, the Company had the option to buy the leased equipment or sell the equipment and give the proceeds to the lessor.

16.     However, undisclosed to investors, as part of its lease agreements, Simon Transportation guaranteed that (upon sale of the leased equipment at the end of the lease agreement) its lessors would recover a specific percentage (usually around 50%) of the costs the lessor incurred in purchasing the equipment that it leased to the Company.  As a result, if the proceeds from the sale of the leased equipment upon termination of the lease were less than the guarantee Simon Transportation made to its lessor, Simon Transportation was obligated to pay the difference.

17.     Simon Transportation never disclosed it had these massive guarantee obligations even though Generally Accepted Accounting Principles ("GAAP") require a company to disclose its contingent losses, such as those arising from guarantee liability.

18.     Moreover, during the class period, Simon Transportation repeatedly and recklessly failed to disclose the very existence of its lease guarantees even though it became increasingly likely that the Company would have to pay on the guarantees due to depressed resale values of used trucking equipment.

19.     Throughout the class period the market price for used equipment was deflated because supply exceeded demand.  This market condition was sufficiently material that Defendants disclosed, in the Company's SEC filings, of its potential adverse effects on the Company's revenues from the sale of used equipment.  Yet, Defendants never disclosed the effect the depressed market would have on the Company's lease guarantees, or even that the

6

Company had guarantees that could be impacted by the depressed tractor/trailer resale market.

20.     It was not until the Company filed its annual report for fiscal year 2001 with the

SEC, on January 14, 2002, that the Company first disclosed the existence of these guarantees.

By that time, however, the Company already estimated that its losses (i.e. what the Company was

going to have to pay) on these massive guarantees would be at least $25 million; that $6 million

of losses would be recognized in the fourth quarter of fiscal 2001; an additional $12 million of

losses would be recognized in fiscal 2002; and that the Company had insufficient cash to pay the

$3.1 million in guarantee liability that came due on September 30, 2001.

21.     Investors were left completely in the dark about the very existence of these

guarantees, only to be told of them after the Company was already in the midst of recognizing

tens of millions in losses.  As a result, the price of the Company's stock was artificially inflated

and investors were damaged thereby.

## JURISDICTION AND VENUE

22.     This action arises under §10(b) of the Securities Exchange Act of 1934

("Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), and §§11 and

15 of the Securities Act of 1933 ("Securities Act").  The Court has jurisdiction over the subject

matter of this action pursuant to 28 U.S.C. §§1331 and 1337, §27 of the Exchange Act and

§22(a) of the Securities Act.

23.     Venue is proper in this district pursuant to §27 of the Exchange Act, §22 of the

Securities Act and 28 U.S.C. §1391(b).  At all times herein mentioned, Simon Transportation's

principal place of business was in this District at 5175 West 2100 South, West Valley City, Utah

7

84120, and the acts alleged herein, including the dissemination of materially false and misleading information, occurred in this District.

24.     In connection with the wrongs alleged herein, Defendants directly or indirectly used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities, and the facilities of the national securities markets.

## THE PARTIES

25.     Plaintiff Clifford McQuarrie purchased shares of Simon Transportation common stock during the class period pursuant to the Company's 401(K) Profit Sharing Plan and was damaged thereby.

26.     Plaintiff Joseph Turner purchased shares of Simon Transportation common stock during the class period pursuant to the Company's employee stock ownership plan and was damaged thereby.

27.     Defendant Richard D. Simon ("Simon") was from the beginning of the class period until September, 2000, Chairman and Chief Executive Officer of Simon Transportation, and President from the beginning of the class period until April 2000. Defendant Simon continued as a director at least until January 12, 2001. Defendant Simon was quoted in and/or responsible for the preparation, approval or release of statements Plaintiff alleges were materially false and misleading, including all press releases and regulatory filings. Defendant Simon, by virtue of his positions as an officer and director, was under a continuing duty to direct and control the operations of Simon Transportation, to exercise due care and diligence in those operations, and to oversee and review all corporate operations, including the filing of documents

8

with the SEC and the making of public statements. Defendant Simon signed the Form 10-K

annual reports filed by the Company for fiscal years 1998 and 1999, which contained false and

misleading statements.

28.     Defendant Alban B. Lang ("Lang") was from the beginning class period until

October 2001, Secretary, Treasurer, and Chief Financial Officer of Simon Transportation.

Defendant Lang was quoted in and/or responsible for the preparation, approval or release of each

statement plaintiff alleges was false and misleading, including all press releases and regulatory

filings. In addition, by virtue of his positions as Treasurer and Chief Financial Officer, Lang was

under a continuing duty to direct and control the operations of Simon Transportation, to exercise

due care and diligence in those operations, and to oversee and review all corporate operations,

including the filing of documents with the SEC and the making of public statements. Defendant

Lang signed all the Form 10-K annual reports and all the Form 10-Q quarterly reports during the

class period that contained false and misleading statements.

29.     By virtue of their positions as officers and/or directors of the Company,

defendants Simon and Lang had the authority and ability to and, in fact, controlled the contents

of the Company's annual and quarterly reports filed with the SEC and press releases. Further, the

actions of the Defendants during the class period caused the material misstatements of the

Company's financial condition and results alleged herein. The Defendants were aware of the

contents of the Company's publicly disseminated reports and press releases alleged herein to be

misleading prior to their issuance and had the ability and opportunity to prevent their issuance or

cause them to be corrected, but failed to do so. The Defendants are each liable for the false

9

statements pleaded herein, as those statements were the result of the collective action of the Defendants and thus constitute "group published" information.

30.     As officers, directors and/or controlling persons of a publicly-held company whose common stock is registered with the SEC, traded on the NASDAQ National Market and governed by provisions of the Exchange Act, Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, markets, management, earnings and present and future business prospects, to correct any previously issued statements from any source that had become untrue, and to disclose any trends that would materially affect earnings and the present and future financial operating results of Simon Transportation, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

31.     It is appropriate to treat Defendants as a group for pleading purposes under the federal securities laws and the Federal Rules of Civil Procedure and to presume that the false and misleading information complained of herein was disseminated through the collective actions of all Defendants.  Defendants were involved in the drafting, producing, reviewing and/or disseminating of the false and misleading information detailed herein, recklessly disregarded that such materially misleading statements were being issued by the Company and/or approved or ratified these statements in violation of the federal securities laws.  Defendants' false and misleading statements and omissions of fact consequently had the effect of, both on their own and in the aggregate, artificially inflating the price of the common stock of Simon Transportation during the class period.

10

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of all other persons or entities who purchased or acquired Simon Transportation stock during the class period and were damaged thereby, excluding Defendants, their affiliates and any officers or directors of Simon Transportation or its affiliates, and any members of immediate families and their heirs, successors and assigns (the "Class").

33.     The Class is so numerous that joinder of all the members of the Class is impracticable.  Plaintiff believes there are hundreds of record holders of the Company's common stock located throughout the United States.

34.     Plaintiff's claims are typical of the claims of absent Class members.  Members of the Class have sustained damages arising out of Defendants' wrongful conduct in violation of the federal securities laws in the same way as Plaintiff sustained damages from the unlawful conduct.

35.     Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel competent and experienced in class and securities litigation.

36.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The Class is numerous and geographically dispersed.  It would be impracticable for each member of the Class to bring a separate action.  The individual damages of any member of the Class may be relatively small when measured against the potential costs of bringing this action, and thus make the expense and burden of this litigation unjustifiable for individual actions.  In this class action, the Court can determine the rights of all

members of the Class with judicial economy.  Plaintiff does not anticipate any difficulty in the

managing this suit as a class action.

      37.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class.  These

questions include, but are not limited to, the following:

      1.     whether Defendants' conduct as alleged herein violated the federal

securities laws;

      2.     whether the SEC filings, press releases and statements disseminated to the

investing public during the class period misrepresented Simon Transportation's financial

condition and results;

      3.     whether Defendants acted with scienter in omitting and/or misrepresenting

material facts;

      4.     whether the market price of Simon Transportation common stock during

the class period was artificially inflated; and

      5.     whether members of the Class have been damaged and, if so, the proper

measure thereof.

## BACKGROUND

### Overview of Simon Transportation

      38.     Simon Transportation, prior to filing for bankruptcy, was a Nevada corporation

headquartered in Utah with truck terminals in Arizona, California, Texas and Georgia.  The

Company specialized in temperature controlled transportation services for major shippers in the

food industry. It operated throughout the United States, Mexico, and in eight Canadian provinces.

39.     The Company was founded in 1955 by defendant Richard Simon and operated as a sole proprietorship until November 17, 1995. On that date the Company had its initial public offering and became a public company, with its stock being traded on the NASDAQ National Market.

40.     In the period following its initial public offering, Simon Transportation exceeded Wall Street earnings expectations for each of its first five quarters as a public company, resulting in a 300% increase in the Company's stock price.

41.     In August of 1999 Jerry Moyes, a well known trucking executive, purchased about 10% of the Company's outstanding stock through open market purchases. Moyes attempted to negotiate with the Company's board of directors to acquire the Company over the next several months. Those negotiations failed. Therefore, on May 23, 2000, Moyes made a tender offer to the Company's shareholders to acquire their shares for $39 million. The offer expired on June 30, 2000 without the requisite number of shares being tendered.

42.     After further negotiations, on August 10, 2000, Moyes reached an agreement with defendant Simon to purchase all of Simon's 913,751 class B shares in the Company for $9.00 per share. The deal was consummated on September 19, 2000. As a part of the deal Moyes was elected as Chairman of the Board. Defendant Simon made $8.2 million in the deal and resigned as Chairman, President, and CEO.

43.     Concurrent with the arrival of new management, the Company finally began

13

reporting its true accident related liabilities and expenses resulting in significantly increased expenses and liabilities.  Then, a little over year after new management had been in place, the Company, for the first time, disclosed the existence of its lease guarantees.  Two weeks later the Company filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court, District of Utah on February 25, 2002.

      44.     Shortly thereafter, on March 12, 2002, the Company and the NASDAQ National Market agreed to permanently suspend the trading of the Company's shares.  In April of 2002 the Bankruptcy Court approved the sale of the Company's assets to Central Refrigerated Service Incorporated, another company controlled by Moyes.

## Overview of the Company's Material Misrepresentations to the Investing Public Concerning its Accident Related Expenses and Liabilities

      45.     During the class period, Simon Transportation under-reported its true expenses and liabilities from accident claims resulting in the Company filing false and misleading annual and quarterly financial reports with the SEC and disseminating false and misleading financial results in press releases.   Specifically, these filings and press releases were false and misleading because they misrepresented the following four financial figures: 1) Accrued Claims Payable; 2) Insurance and Claims Expense; 3) Operating Ratio; and 4) reported earnings (or, in some instances, losses) for the period.

      46.     First, the Company under-reported its Accrued Claims Payable.  Accrued Claims Payable was purported to represent the total liability Simon Transportation had as a result of past accidents involving its drivers including workers compensation costs.  During the class period,

Simon Transportation repeatedly under-reported its existing liability for the Company's past accidents. By under-reporting its Accrued Claims Payable, Simon Transportation presented the illusion of lower liabilities for the Company than was actually the case, resulting in an artificially higher stock price.

47.     Second, Simon Transportation misrepresented the amount of its Insurance and Claims expense during the class period. The Insurance and Claims expense purported to represent the amount of accident related expense that the Company incurred during a particular reporting period (even if the amount would be paid in later periods). The Insurance and Claims expense is unlike the Accrued Claims Payable figure, which represents the total accident related liability of the Company, not just the expense incurred in a specific period. During the class period Simon Transportation repeatedly under-reported its insurance and claims expense; that is, the Company had incurred greater accident related expenses than reported in its SEC filings or otherwise publicly disseminated. By under-reporting its Insurance and Claims expense, Simon Transportation presented the illusion of greater operational and financial success than was actually the case, resulting in an artificially higher stock price.

48.     Third, by under-reporting its Insurance and Claims expense, the Company was able to report a misleadingly low Operating Ratio during the class period. The Operating Ratio was defined by the Company as the ratio of operating expense to revenue and was expressed as a percentage of revenue. By under-reporting its Insurance and Claims expenses, Simon Transportation significantly improved (i.e. lowered) its Operating Ratio and thereby presented the illusion of greater operational and financial success than was actually the case, resulting in an

artificially higher stock price.

49.    Fourth, the Company reported inflated earnings (or in some instances under-stated its losses) by under-reporting its Insurance and Claims expense.  By reporting lower expenses than actually incurred, Simon Transportation was able to overstate its earnings.  As a result, Simon Transportation presented the illusion of greater operational and financial success than was actually the case, resulting in an artificially higher stock price.

## SUBSTANTIVE ALLEGATIONS

### The Company Under Reported Accrued Claims Payable and Accident Expenses

50.    During the class period, the Company maintained an inadequate reserve for its Accrued Claims Payable, as demonstrated by a large upward adjustment to its Accrued Claims Payable taken in the fourth quarter of fiscal year ending 2000[3].  This large increase to the Company's Accrued Claims Payable liability, was purportedly a one-time catch-up charge, which increased the Company's Accrued Claims Payable from $2.0 million to $8.9 million, an increase of over 300%.

51.    This one-time charge, euphemistically described as a "cumulative effect of accounting change", was in essence a restatement of the Company's previously reported Insurance and Claims expenses in its prior financial reports.  Essentially, this large upward adjustment to its Accrued Claims Payable was to make up for the fact that the Company had previously reported insufficient insurance and claims expense that inaccurately reflected the

---

[3]

The Company's fiscal year begins on October 1, and ends on September 30.

16

Company's true liability from past accidents.

52.     Tellingly, this charge was taken after the arrival of new management, and not

because of any new information or facts about these past accident claims.  Rather, the charge was

based on the same information that the old management had, but under new management resulted

in a $6 million gross increase to the Accrued Claims Payable liability from past accidents.  This

charge was disclosed as follows in the Company's fiscal 2000 Form 10-K, filed on January 12,

2001:

> ....Prior to October 1, 1999, the Company provided a reserve for workers' compensation
> and automobile related liabilities for each reported claim on a case by case basis plus an
> allowance for the cost of incurred but not reported claims.  Effective October 1, 1999, the
> Company changed its method of accounting for workers' compensation and accident
> claims.  The Company adopted a fully-developed claims expense estimate based on an
> actuarial computation of the ultimate liability.  Both the method formerly used by the
> Company and the fully-developed method are acceptable under accounting principles
> generally accepted in the United Stated (GAAP).

53.     Defendants had been reckless in their prior method of determining and disclosing

the Company's liability for accidents claims notwithstanding the bald assertion that the prior

method conformed with GAAP.  This is demonstrated by the fact that the Company was required

to increase its liability by over 300% for these past accidents even though the Company,

according to its own disclosure, had no new facts or additional information about these accidents.


54.     The inadequacy of past management's accounting for the Company's insurance

liabilities was later acknowledged in an article published in the Wall Street Journal on April 8,

2002.  The article stated, in pertinent part:

17

Adding to Simon's woes were truck-accident suits filed against it before Mr. Moyes took control of it, according to Gordon Holladay, a Simon board member and chief financial officer of SME Steel Contractors, a Salt Lake City concern that is 95% owned by Mr. Moyes. <u>Those lawsuits bruised Simon's balance sheet by forcing it to pay a $1 million deductible and double the reserves set aside for such insurance losses,</u> Mr. Holladay said. (emphasis added).

Mr. Holladay went on to state:

"[Moyes] took [Simon Transportation] over, believing that he could fix a lot of the problems....<u>As it turns out, there were more skeletons in the closet than one could ever determine looking in from the outside.</u>" (emphasis added)

55.     Once the Company began to properly account for its accident expenses, the Company's Insurance and Claims expense for the remainder of the class period was dramatically effected as shown by the following table:

| | Q1 2000 | Q2 2000 | Q3 2000 | Q4 2000 | Q1 2001 | Q2 2001 | Q3 2001 | Q4 2001 | Q1 2002 |
|---|---|---|---|---|---|---|---|---|---|
| INSURANCE AND CLAIMS EXPENSE | $1.4 M | $1.6 M | $1.9 M | $11.6 M | $3.5 M | $3.7 M | $4.7 M | $4.8 M | $6.4 M |

Source: Company's SEC filings

## The Company Misrepresented its Safety and Training Standards for Drivers

56.     During the class period, Defendants misrepresented the Company's safety and training policies for its drivers, making it impossible for investors to appreciate and assess the risk to the Company from increased accidents, liability, expense, and lawsuits that poorly trained drivers and unsafe policies would cause.

57.     The Defendant's purported safety and training procedures were published in the Company's 10-K annual reports filed with the SEC. The following is a representative disclosure from the Company's fiscal 2000 Form 10-K filed with the SEC on January 12, 2001:

Simon Transportation emphasizes safety in all aspects of its operations.  Its safety program includes: (i) initial orientation, (ii) a three-week to six-week, on-the-road training program; and (iii) progressive penalties for excessive speed and log violations.  The Company has earned the highest DOT safety and fitness rating of "satisfactory," which most recently was extended on July 6, 2000.

58.     However, unbeknownst to investors, the foregoing statement, and similar

statements, were materially false and misleading because the Company failed to disclose that it

(1) did not have an on-the-road training program that lasted a minimum of three weeks; (2)

rehired drivers that it had previously terminated due to poor driving habits; and (3) hired drivers

that the Company's own trainers thought were unqualified.  The Company was motivated to

abrogate its reported safety and training policies in order to meet customer demand in the face of

an industry wide shortage of qualified drivers.  (The Sacramento Bee reported on March 3, 2001,

that the industry wide shortage had grown to 80,000 drivers.)   As a result of misrepresenting its

actual safety and training policies, the Company's stock price was artificially inflated and

investors were damaged thereby.

59.     The Company's deficient safety and training program began coming to light on

January 16, 2001, when Michael Bowers, a Simon Transportation driver, crashed his truck into

the California state Capitol Building, killing himself in the process.

60.     After the crash it was revealed that Bowers, who had a history of mental

problems, violent criminal convictions, and substance abuse, had only received thirteen days of

training from Simon Transportation.  According to an article in the Desert News published on

January 18, 2001, it was Simon Transportation that made this disclosure.  The article stated:

The trucking company, doing business as Simon Transportation Services, released a terse

19

statement Wednesday afternoon [January 17, 2001] identifying Bowers. He drove for the company <u>from March 10 to March 23, 2000, as a trainee</u>, then as a regular employee since Jan. 9, says the statement. (emphasis added).

61.     In the aftermath of the crash, more information came to light that demonstrates

that Defendants' previous representations concerning its safety and training policies were

materially false and misleading. For example, according to a former employee, the Company

often rehired drivers that it had previously terminated due to poor driving habits. This

information was reported in a <u>Sacramento Bee</u> article dated March 31, 2001, which stated:

> [F]ormer employees [of Simon Transportation] have accused the company of compromising safety in the interest of keeping trucks on the road....Paula Gifford, a former fleet manager for Dick Simon Trucking said it was common for the Company to fire a driver one week for poor driving habits and then rehire him the next when it ran short of drivers.

62.     Shockingly, it was further revealed that the Company would hire drivers even

when the Company's own training instructors deemed those drivers unfit to drive the trucks

safely. For example, Glen Horn, a former Simon Transportation employee who trained Michael

Bowers, stated that he recommended that the Company not hire Bowers. When the Company

hired Bowers anyway, Horn resigned in protest. The March 3, 2001 <u>Sacramento Bee</u> article

stated:

> Horn...said that the quality of trainees at Dick Simon Trucking dropped over the last few years as the driver shortage grew more severe....Of all the drivers he trained, Horn said, it was immediately clear that Bowers was the worst....An hour and a half into the training run from Salt Lake City, Horn pulled his rig over and told Bowers to get out. Company officials, however, ordered Horn to continue training Bowers until they reached Atlanta...."He [Bowers] started getting road rage," [Horn] said."He would yell at cars and trucks. I told (Dick Simon officials) 'If this guy goes ballistic on me, I'm going to wreck.'..."Old Mike Bowers -- he almost hit a Geo Metro going into Kansas City," Horn said. "I had to reach over and yank the wheel."...<u>When they returned to Utah, Horn said,</u>

<u>he recommended that Bowers be let go. Instead, the company hired Bowers</u>, and it was Horn who quit in disgust...."He's the guy I left for," he said. "I just couldn't take it anymore." (emphasis added.).

63.    Furthermore, the Bowers incident was not isolated.  The March 3, 2001 <u>Sacramento Bee</u> article reported that, according to Horn, "other trainees besides Bowers...were hired despite poor ratings from their instructor."

64.    For example, on April 6, 2001, the <u>Sacramento Bee</u> reported that the Company hired, Ronald Purta, despite the urging of his trainer not to hire Purta.  Purta would later cause a crash that left two people dead and another with permanent brain damage.   The article stated:

California officials say they also are interested in Purta's training run with a Dick Simon driver in January 1998 -- a ride that mirrors the harrowing practice run Bowers had with his trainer, Glenn Horn. Both trips ended with the trainers urging Dick Simon officials not to hire the new recruits....Steve Miller, who trained Purta, said he contacted Dick Simon headquarters a dozen times with concerns about Purta during their run to Portland, Ore....Miller said the training run ended at a weigh station in Idaho where Purta, 52 at the time, bolted from the truck, flagged down an Idaho state trooper and accused Miller of sexually harassing him and tampering with his driver logs. That officer, Larry Torix, reported there was nothing wrong with the log books, but he recommended that Dick Simon officials re-evaluate Purta. "It didn't seem to me like he was stable enough to drive the truck," Torix wrote in his report. Less than three weeks after the incident in Idaho -- and against the urging of Miller -- Dick Simon gave Purta his own truck.  According to incident reports in the court record, Purta immediately had problems controlling his rig.

65.    Because of the severe driver shortage during the class period, the Company hired drivers who were unsafe thus violating its own purported safety policies.  As Glen Horn stated in the March 3, 2001 article: "They [Simon Transportation] need bodies.  They need drivers,...If you were breathing, you got the job."

66.    Defendants never disclosed that they had compromised the Company's purported

safety and training policies due to the driver shortage.  Rather, the Company continued to publish

materially false and misleading statements that emphasized and touted the Company's purported

safety and training policies.  As a result, investors had no way of knowing that the Company was

at substantially greater risk of increasing accidents, liability, expenses, and lawsuits.  Ultimately,

the Company incurred massive liability that directly emanated from its derogation of its own

safety and training policies.  This  included an action filed by the State of California in August

2001 which sought $13.5 million in actual damages and $100 million in punitive damages

(which are uninsurable under Utah State law) arising from Bower's crash into the Capitol

building.

  67.  Defendants recklessly disregarded that the Company's statements concerning its

safety and training policies were materially false and misleading.  As a result of the false and

misleading statements, the price of the Company's stock was artificially inflated and investors

were damaged thereby.

**The Company Failed to Disclose $126.1 Million in Guarantee Liability**

  68.  During the class period, Defendants recklessly omitted to disclose in the

Company's SEC filings that the Company had $126.1 million in guarantee liability arising

primarily from operating leases in which the Company guaranteed the residual value of its leased

tractors and trailers.  The failure to disclose this massive guarantee liability rendered the

Company's SEC filings materially false and misleading as the Company was subject to

substantially greater loss exposure than its SEC filings indicated.  As investors were not

informed of the risk of devastatingly large losses from the guarantees, the Company's stock price

was artificially inflated.

69.     It was not until the Company filed its Form 10-K annual report for fiscal year

2001, on January 14, 2002, that the Company finally acknowledged that the guarantees even

existed.  However, by that time, the Company had already estimated the actual losses on its lease

guarantees would be an astounding $25 million; that the Company was recognizing $6 million in

losses in the fourth quarter of fiscal 2001; an additional $12 million of losses would be

recognized in fiscal 2002; and that the Company had insufficient cash to pay the $3.1 Million in

guarantee liability that came due on September 30, 2001.

### Nature of the Company's Guarantees to its Lessors

70.     During the class period, Simon Transportation largely conducted its operations

through the use of leased tractors and trailers.  Consequently, the Company had a large number of

lease agreements with various leasing companies and capital financing companies.  The majority

of these lease agreements, many of which are attachments to filings in the Bankruptcy Court,

were entered into before the class period, but remained operative throughout the class period.

71.     While the lease agreements Simon Transportation had with its lessors were varied,

the agreements had several elements in common.  First, Simon Transportation had the option to

purchase the leased equipment at, or prior to, termination of the lease agreement.  Second, if the

Company chose not to purchase the leased equipment when the lease ended, the Company was

generally obligated to sell the equipment at fair market value and give the proceeds to the lessor

that had leased the equipment to the Company.

72.     In addition, the lease agreements also contained Terminal Rental Adjustment

23

clauses. The main purpose behind these clauses was to guarantee that the lessor would recover (at the end of the lease term) a certain percentage of the costs it incurred in purchasing the equipment that it leased to Simon Transportation. Typically, this value was set at about 50% of what the lessors costs were; although, in some cases the value was as high as 55%.

73.    For example, in March of 1996, Simon Transportation entered into a master lease agreement with BancBoston Leasing Inc.[4], which over time led the latter to lease to Simon Transportation 65 trailers. The various leases executed under the master lease agreement each included a Terminal Rental Adjustment clause.

74.    The Terminal Rental Adjustment clause provided that at the conclusion of the lease agreement the trailer was to be sold either to Simon Transportation or to another party. The proceeds from the sale were to be the lessors if they equaled 50% of the cost incurred by the lessor in initially acquiring the trailer it leased to Simon Transportation. If the proceeds from the sale were greater than 50% of the lessors costs, the lessor received an amount equal to 50%. The remaining amount (the amount above 50% of the lessors' costs) would be retained by Simon Transportation.

75.    If the sale yielded an amount less than 50% of the lessor's costs, then Simon was obligated to pay an amount equal to 50% of the lessor's acquisition costs, minus the amount the trailer sold for. In other words, except as noted in the footnote below, Simon Transportation guaranteed the difference between the amount the trailer sold for after the lease expired and 50%

---

[4]

First Union Commercial Corporation later became a successor in interest to these agreements.

of the costs incurred by the lessor in acquiring the trailer it leased to Simon Transportation.[5]

76.     Substantially similar Terminal Rental Adjustment clauses were a part of most, if not all, of the Company's lease agreements. Either Defendant Simon or Lang executed the Company's lease agreements that contained the Terminal Rental Adjustment clauses, including those it entered into with:  NationsBanc Leasing Corp. in 1993 (in which Banc of America Leasing & Capital LLC became a successor in interest to the agreement); First Union Commercial Corp. in 1993; BancBoston Leasing, Inc. in 1996 and CoreStates Leasing Inc. in 1997 (in which First Union Commercial Corp. became a successor in interest to both agreements); Fleet Credit Corp. in 1995 and TBCC Funding Trust in 2000 (in which TransAmerica Equipment Financial Services Corp. became a successor in interest to both agreements).

### The Company's Omitted to Disclose its Guarantee Liability

77.     The foregoing lease agreements were operative throughout the class period.  Yet the Company never disclosed that it had, in its lease agreements, guaranteed a substantial portion of the residual value of its leased tractors and trailers.  Throughout the class period, the Company filed annual and quarterly reports with the SEC that disclosed its leases, payment schedules, and liabilities without disclosing the related guarantees.

_____

[5]

More precisely, in this agreement, Simon Transportation was never obligated to pay an amount to the lessor greater than 30% of the lessor's acquisition costs.  Thus, if the trailer sold for less than 20% of the lessors acquisition costs, Simon Transportation was obligated to pay only 30% of the lessor's acquisition costs (in such a case the lessor would recover less than 50% of its acquisition costs).

25

78.     However, the Company was required to disclose the nature and the amount of its

guarantees for its financial statements to comply with GAAP, specifically, Financial Accounting

Standards Board Statement of Financial Accounting Standards No. ("FAS 5") ¶ 1, which states:

> For the purpose of this Statement, a contingency is defined as an existing condition,
> situation, or set of circumstances involving uncertainty as to possible gain (hereinafter a
> "gain contingency") or loss (hereinafter a "loss contingency") to an enterprise that will
> ultimately be resolved when one or more future events occur or fail to occur.....

79.     The Company's $126.1 million in guarantees was a loss contingency, as defined

by FAS 5 ¶ 1, because the guarantees exposed the Company to potential losses from having to

pay its lessors up to $126.1 million dollars should the resale price of their tractors be insufficient

to cover the guaranteed residual lease values.

80.     Pursuant to FAS 5 ¶ 12, disclosure of the existence of the guarantees was

necessary even if the risk of loss on the guarantees was remote.  As stated in FAS 5 ¶ 12:

> Certain loss contingencies are presently being disclosed <u>even though the possibility of
> loss   may be remote.  The common characteristic of those contingencies is a
> guarantee</u>....The Board concludes that disclosures of those loss contingencies, and others
> that in substance have the same characteristics, shall be continued.  The disclosure shall
> include the nature and amount of the guarantee....(emphasis added)

81.     Moreover, pursuant to FAS 5 ¶¶ 8 and 10[6], the Company was required to either

accrue or disclose these guarantees because it was certainly "reasonably possible that a loss may

have been incurred" by the Company on these guarantees due to the declining market for used

trucking equipment.

_____

[6]

See ¶ 142 for the text of FAS 5 ¶¶ 8 and 10.

26

82.     This was admitted by the Company itself, in its fiscal 1999 Form 10-K annual

report, filed on December 14, 1999, which contained the following statement:

> The Company historically has recognized a gain on the sale of its revenue equipment. The market for used equipment has experienced greater supply than demand in 1998 and 1999. If the resale value of the Company's revenue equipment were to decline, the Company could find it necessary to dispose of its equipment at lower prices or retain some of its equipment longer, with a resulting increase in operating expenses. (emphasis added).

83.     Again, in the Company's Form 10-K for fiscal 2000, filed on January 12, 2001,

the Company disclosed:

> The Company historically has recognized a gain on the sale of its revenue equipment. The market for used equipment has experienced greater supply than demand in 1998, 1999 and 2000. If the resale value of the Company's revenue equipment were to decline, the Company could find it necessary to dispose of its equipment at lower prices or retain some of its equipment longer, with a resulting increase in operating expenses. (emphasis added).

84.     Similarly, in the Company's Form 10-Q quarterly report for the fiscal first quarter

of 2001, filed on February 14, 2001, the Company stated that "[b]ecause of a softening of the

market for used equipment, management does not expect gains on the sale of revenue equipment

to continue as in the past." Finally, the Company repeated this warning in its Form 10-Q

quarterly report for the second quarter of fiscal 2001.

85.     These statements, that the supply was greater than demand for used equipment,

shows that Defendants knew that the market for used equipment was saturated and likely to

negatively impact the residual value of the Company's leased equipment and, hence, the potential

that the Company would have to make payments on its guarantees to its lessors.

86.     The $126.1 million in guaranteed residual lease value should have been disclosed

27

by the Company during the class period pursuant to GAAP.  Regardless, even if GAAP did not

require such a disclosure, the shear magnitude of the loss potential facing the Company (which

exceeded the total assets held by the Company in fiscal 2000), combined with the Company's

own acknowledgment that the market suffered from an oversupply of used equipment making

losses on the guarantees probable, rendered the Company's failure to disclose the existence of

these guarantees in its SEC filings materially false and misleading.

87.     It was not until January 14, 2002 when the Company filed its Form 10-K for fiscal

year 2001, that the Company finally disclosed its guarantee liability.  The Company's Form 10-K

for fiscal 2001, states, in pertinent part:

> The Company has guaranteed a substantial portion of the residual values on all of its
> leased tractors and trailers. These residual guarantees total approximately $126.1 million
> at September 30, 2001. Based upon current market prices for used tractors and trailers,
> management estimates that the difference between the residual guarantees and the
> projected value of the equipment at the termination of the leases is approximately $25.0
> million. Effective August 1, 2001, the Company began accruing this potential liability
> over the remaining life of the leases in accordance with EITF 96-21. As of September 30,
> 2001, the Company has recorded an accrued liability for guaranteed lease residuals of
> $6.4 million. Prior to August 1, 2001, it was not probable that any residual guarantee
> payments would be required. The remainder of the estimated loss (as adjusted for future
> market conditions) will be accrued over the remaining terms of the related leases.
> Assuming the used equipment markets maintain their current levels, management expects
> it will accrue additional liability for guaranteed residuals of $12.5 million in fiscal 2002.

88.     The Defendants' scienter is seen by their recklessness in not disclosing in the

Company's filings with the SEC what was clearly a material loss contingency.  The Defendants

knew of this loss contingency because both defendant Simon and defendant Lang executed

numerous lease agreements prior to the class period which created this large loss potential for the

Company.

89.     Further, the Company's SEC filings demonstrate that the Defendants were aware of the oversupply of used equipment as early as December 14, 1999 when the Company filed its fiscal 1999 Form 10-K annual report.   Yet, the Company still failed to disclosed the existence of the guarantees despite the knowledge that its exposure for losses on its guarantees were greatly increased.  Defendants recklessly disregarded the risks to the Company from the guarantees, heightened by the declining resale market, was information that an investor would want to know.

90.     The importance of this type of information to investors is highlighted by the fact that the Company did disclose the risk that a declining resale market could have on revenues. However, despite the importance of this information, Defendants recklessly failed to disclose that the same declining resale market could negatively impact the Company's earnings in the form of losses from the guarantees.  In fact, as far as investors knew, the Company did not have any guarantees that could be affected by a declining resale market.

91.     Defendants recklessly disregarded that the Company's SEC filings were false and misleading because they failed to disclose the existence of these guarantees.  As a result of the omissions, the price of the Company's stock was artificially inflated and investors were damaged thereby.

## DEFENDANTS' MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD

### Materially False and Misleading Statements and Material Omissions Regarding Accident Liabilities and Expenses

92.     The following statements were materially false and misleading when made, and were made with scienter as set forth in ¶¶ 111-114 below.

29

93.     On July 13, 1998, Defendants publicly disseminated a press release, announcing

the Company's third-quarter 1998 fiscal year results, which states in pertinent part:

> Simon Transportation  Services Inc. (Nasdaq: SIMN) announced today revenues and
> operating results for the third quarter of fiscal 1998 and the nine months ended June 30,
> 1998.
>
> Revenue for the third quarter increased 22% to $50.1 million, compared with $41.2
> million for the corresponding quarter of fiscal 1997.  Net loss was ($270,000) or ($.04)
> per diluted share, compared with net earnings of $3,060,000 or $.48 per diluted share for
> the corresponding quarter a year ago.
>
> For the first nine months of fiscal 1998, revenue increased 29% to $143.2 million from
> $111.1 million for the corresponding period of fiscal 1997.  Net earnings were $16,000 or
> $.00 per diluted share, compared with $5,679,000 or $1.01 per diluted share in the 1997
> period.

94.     On August 4, 1998, the Company filed an amended Form 10-Q quarterly report

for the Company's fiscal third quarter which ended on June 30, 1998.  In that filing, the

Company reported that its Accrued Claims Payable were $1,169,102; its Insurance and Claims

Expense for the quarter was $1,232,362, or 2.5% as a percentage of revenue; its net loss for the

quarter was ($270,368) or a loss of ($.04) per diluted share; and its Operating Ratio for the

quarter was 100.2%.

95.     On October 15, 1998, Defendants publicly disseminated a press release,

announcing the Company's fourth quarter 1998 fiscal year financial results.  Although

acknowledging that "accident claims were another area of concern," Defendants diminished the

concern and failed to disclose that the Company under-reported its true accident expenses

liability. The October 15, 1998, press release states in pertinent part:

> Simon Transportation Services Inc.(Nasdaq: SIMN) announced today revenues and

operating results for the fourth quarter and fiscal year ended September 30, 1998.

Revenue for the fourth quarter increased 14% to $50.3 million, compared with $44.2 million for the corresponding quarter of fiscal year 1997. Net earnings were $322,000 or $.05 per diluted share, compared with net earnings of $2,099,000 or $.33 per diluted share for the corresponding quarter a year ago.

For the fiscal year ended September 30, 1998, revenue increased 25% to $193.5 million from $155.3 million last year. Net earnings were $338,000 or $.05 per diluted share, compared with $7,779,000 or $1.33 per diluted share last year.

Accident claims were another area of concern earlier in the year. Insurance and claims expense had been approximately 2.1% and 2.2% of revenue in fiscal 1996 and 1997, respectively. An unusual occurrence of severe accidents in the second quarter of fiscal 1998 inflated these expenses to 4.1 % of revenue for the quarter. We focused on safety issues, strengthened our safety program, and appointed a new safety director. Insurance and claims expense has improved to 2.5% of revenue in the third quarter and 2.1% of revenue for the fourth quarter.

96.     On November 13, 1998, the Company filed its Form 10-K annual report for the

Company's 1998 fiscal year which ended on September 30, 1998. The report also included

results for the fiscal 1998 fourth quarter which also ended on September 30, 1998. In that filing,

the Company reported that its Accrued Claims Payable was $1,260,827; its Insurance and Claims

Expense for the year was $5,216,804 (2.7% as a percentage of revenue for the year), thus making

the expense for the quarter $1,064,744; its net earnings for the quarter was $322,000 or $.05 per

diluted share; net earnings for the year was $338,144 or $.05 per diluted share; and that its

Operating Ratio for the year was 98.9%.

97.     On January 15, 1999, Defendants continued to mislead investors as to the

Company's true operating results with a publicly disseminated press release announcing the

Company's first-quarter 1999 fiscal year financial results, which states in pertinent part:

> Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenues and operating results for the quarter ended December 31, 1998, the Company's first quarter of its 1999 fiscal year.
>
> Revenues for the first quarter increased 13% to $53.0 million, compared with $47.0 million for the corresponding quarter of fiscal year 1998. Net earnings were $45,000 or $.01 per diluted share, compared with net earnings of $1,864,000 or $.29 per diluted share for the corresponding quarter a year ago.

98.   On February 12, 1999, the Company filed its Form 10-Q quarterly report for the Company's fiscal first quarter which ended on December 31, 1998. In that filing, the Company reported that its Accrued Claims Payable were $1,371,197; its Insurance and Claims Expense for the quarter was $1,356,475 or 2.6% as a percentage of revenue; its net earnings for the quarter were $45,140 or $.01 per diluted share; and that its Operating Ratio for the quarter was 99.3%.

99.   On April 15, 1999, Defendants publicly disseminated a press release, announcing the Company's second quarter 1999 fiscal year financial results, which states in pertinent part:

> Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenues and operating results for the second quarter of fiscal 1999 and the six months ended March 31, 1999.
>
> Revenues for the second quarter increased 7% to $49.3 million, compared with $46.1 million for the corresponding quarter of fiscal year 1998. Net loss was $1.9 million or 32 cents per diluted share, compared with a net loss of $1.6 million or 25 cents per diluted share for the corresponding quarter a year ago.
>
> For the first six months of fiscal 1999, revenues increased 10% to $102.3 million, compared with $93.2 million for the corresponding period in fiscal 1998. Net loss was $1.9 million or 31 cents per diluted share, compared with net earnings of $0.3 million or 4 cents per diluted share in the fiscal 1998 period

100.   On May 14, 1999, the Company filed its Form 10-Q quarterly report for the Company's fiscal second quarter which ended on March 31, 1999. In that filing, the Company

32

reported that its Accrued Claims Payable were $1,781,502; its Insurance and Claims Expense for the quarter was $1,760,834 or 3.6% as a percentage of revenue; its net loss for the quarter was ($1,926,411) or a loss of ($.32) per diluted share; and that its Operating Ratio for the quarter was 105.5%.

101.    On July 16, 1999, Defendants publicly disseminated a press release, announcing the Company's third-quarter 1999 fiscal year financial results, which states in pertinent part:

> Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenues and operating results for the third quarter of fiscal 1999 and the nine months ended June 30, 1999.
>
> Revenues for the third quarter increased 7% to $53.6 million, compared with $50.1 million for the corresponding quarter of fiscal year 1998.  Net loss was $0.9 million or 14 cents per diluted share, compared with a net loss of $0.3 million or 4 cents per diluted share for the corresponding quarter a year ago.
>
> For the first nine months of fiscal 1999, revenues increased 9% to $155.9 million, compared with $143.2 million for the corresponding period in fiscal 1998.  Net loss was $2.7 million or 45 cents per diluted share, compared with net earnings of $16,500 or 0 cents per diluted share in the fiscal 1998 period.

102.    On August 6, 1999, the Company filed its Form 10-Q quarterly report for the Company's fiscal third quarter which ended on June 30, 1999.  In that filing, the Company reported that its Accrued Claims Payable were $1,598,423; its Insurance and Claims expense for the quarter was $1,849,620 or 3.5% as a percentage of revenue; its net loss for the quarter was ($866,465) or a loss of ($.14) per diluted share; and that its Operating Ratio for the quarter was 102.0%.

103.    On October 15, 1999, Defendants publicly disseminated a press release, announcing the Company's fourth quarter and 1999 fiscal year financial results, which states in

pertinent part:

> Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenue and operating results for the fourth quarter and fiscal year ended September 30, 1999.
>
> Revenue for the fourth quarter increased 6% to $53.3 million, compared with $50.3 million for the corresponding quarter of fiscal year 1998.  Net loss was $0.5 million or 8 cents per diluted share, compared with net earnings of $0.3 million or 5 cents per diluted share for the corresponding quarter a year ago.
>
> For fiscal 1999, revenue increased 8% to $209.1 million, compared with $193.5 million for fiscal 1998.  Net loss was $3.2 million or 53 cents per diluted share, compared with net earnings of $0.3 million or 5 cents per diluted share in fiscal 1998.

104.    On December 14, 1999, the Company filed its Form 10-K annual report for the Company's 1999 fiscal year which ended on September 30, 1999.  The report also included results for the fiscal 1999 fourth quarter which also ended on September 30, 1999.  In that filing, the Company reported that its Accrued Claims Payable was $1,970,336; its Insurance and Claims expense for the year was $6,591,246 (3.2% as a percentage of revenue for the year), thus making the expense for the quarter $1,624,317; its net loss for the quarter was ($486,000) or ($.08) per diluted share; net loss for the year was ($3,233,493) or ($.53) per diluted share; and that its Operating Ratio for the year was 101.8%.

105.    On January 14, 2000, the Company announced its first quarter 2000 fiscal year financial results.  The press release states in pertinent part:

> Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenue and operating results for the quarter ended December 31, 1999, the Company's first quarter of its 2000 fiscal year.
>
> Revenue for the first quarter increased 2% to $53.9 million, compared with $53.0 million for the corresponding quarter of fiscal year 1999.  Net loss was $141,000 or 2 cents per diluted share, compared with net earnings of $45,000 or 1 cent per diluted share for the

corresponding quarter a year ago.

Chairman, President and Chief Executive Officer Richard D. Simon stated: "We are beginning to realize the benefits of our efforts to improve customer service, retain our drivers and select more profitable freight.  Our operating ratio has improved 5.7% over the past four quarters.

106.    On February 15, 2000, the Company filed its Form 10-Q quarterly report for the

Company's fiscal first quarter which ended on December 31, 1999.  In that filing, the Company

reported that its Accrued Claims Payable were $1,907,428; its Insurance and Claims Expense for

the quarter was $1,423,570 or 2.6% as a percentage of revenue; its net loss for the quarter was

($141,215) or a loss of ($.02) per diluted share; and that its Operating Ratio for the quarter was

99.8%.

107.    On April 12, 2000, Defendants publicly disseminated a press release, announcing

the Company's second quarter 2000 fiscal year financial results, which states in pertinent part:

Simon Transportation Services, Inc. (Nasdaq: SIMN) announced today financial results for the fiscal second quarter and the six months ended March 31, 2000.

Revenues for the second quarter increased 12% to $55.2 million, compared to $49.3 million for the second quarter of fiscal year 1999.  The Company earned $78,000, or $.01 per diluted share, compared with a net loss of $1.9 million, or ($0.32) per diluted share for the second quarter of fiscal year 1999.

For the first six months of fiscal 2000, revenues increased 7% to $109.0 million, compared with $102.3 million for the first six months of fiscal 1999.  Net loss was $63,000, or ($0.01) per diluted share compared with a net loss of $1.9 million, or ($0.31) per diluted share for the corresponding period of fiscal 1999.

OPERATING HIGHLIGHTS

-- The Company lowered its operating ratio by 6.5 points compared to the same period a year ago.

-- The Company lowered its operating ratio for the fourth consecutive quarter.

-- The Company has extended P/L P/D insurance (first million dollars) for two years at the 1999 rate.

108.    On May 12, 2000, the Company filed its Form 10-Q quarterly report for the Company's fiscal second quarter which ended on March 31, 2000.  In that filing, the Company reported that its Accrued Claims Payable were $2,206,554; its Insurance and Claims Expense for the quarter was $1,588,567 or 2.9% as a percentage of revenue; its net earnings for the quarter were $77,917 or a loss of $.01 per diluted share; and that its Operating Ratio for the quarter was 99.0%.

109.    On July 21, 2000, Defendants announced the Company's third-quarter 2000 fiscal year financial results.  The press release states in pertinent part:

> Simon Transportation Services Inc. (Nasdaq: SIMN) announced today revenues and operating results for the third quarter of fiscal 2000 and the nine months ended June 30, 2000.
>
> Revenues for the third quarter increased 13.7% to $60.9 million, compared with $53.6 million for the corresponding quarter of fiscal year 1999.  Net loss was $267,000 or 4 cents per diluted share, compared with a net loss of $866,000 or 14 cents per diluted share for the corresponding quarter a year ago.
>
> For the first nine months of fiscal 2000, revenues increased 9.0% to $170.0 million, compared with $155.9 million for the corresponding period in fiscal 1999.  Net loss was $331,000 or 5 cents per diluted share, compared with a net loss of $2.7 million or 45 cents per diluted share in the fiscal 1999 period.

110.    On August 15, 2000, the Company filed its Form 10-Q quarterly report for the Company's fiscal third quarter which ended on June 30, 2000.  In that filing, the Company reported that its Accrued Claims Payable were $2,004,171; its Insurance and Claims Expense for

the quarter was $1,925,803 or 3.2% as a percentage of revenue; its net loss for the quarter was ($267,450) or a loss of ($.04) per diluted share; and that its Operating Ratio for the quarter was 100.1%.

111.    Defendants recklessly disregarded that the preceding statements contained in these press releases and SEC filings were materially false and misleading.  Specifically, the filings were materially false and misleading because the reported figures for the Company's Accrued Claims Payable and Insurance and Claims expense were grossly understated and did not reflect the Company's true accident related expenses and liabilities as alleged in ¶¶ 50-55.  In addition, the filings and press releases were materially false and misleading because the Company's earnings and earnings per share were inflated (or loss and loss per share understated) due to the Company's failure to accurately report accident related expenses.   The filings were also materially false and misleading because the Company's Operating Ratio was materially understated due to the Company's failure to accurately report the actual amount of expenses for its accidents.

112.    The Company's under-reporting of its true accident related expenses and liabilities, and the consequent inflation of earnings and understatement of Operating Ratio, is evidenced by Mr. Holladay's admission in the Wall Street Journal article published April 8, 2002, that accident related lawsuits from prior periods forced the company to increase its reserves for insurance related losses.  The under-reporting of the Company's accident related expenses and liabilities is further evidenced by the massive increase in Accrued Claims Payable and Insurance and Claims expense that the company reported in its 10-K annual report for fiscal

37

year 2000 filed on January 12, 2001, which in effect was a restatement of prior reported and accident expense and liability.  By failing to disclose the Company's actual accident related expenses and liabilities, Defendants' artificially inflated the Company's stock price and portrayed the Company more attractively to investors.

113.   Defendants' recklessness in misrepresenting the Company's accident related expenses and liabilities (thus inflating the Company's earnings and understating its Operating Ratio) in the Company's press release and SEC filings is demonstrated by the magnitude of the increase in Accrued Claims Payable and Insurance and Claims expense that the Company reported in its 10-K annual report for fiscal year 2000; a $6 million increase in Accrued Claims Payable to adjust prior reported insurance and claims expense.  The large charge demonstrates how inadequate the Company's previous method was in determining its Accrued Claims Payable. The recklessness of the Defendants is further shown by the fact that Defendants, as senior managers of the Company, were responsible for setting accounting policy and choosing the methodology by which accident liability was to be determined.

114.   Defendants' recklessness is further demonstrated by the fact that Company claimed to periodically check the amount it had accrued for accident related expenses to the actual cost of its liabilities to determine whether the liability it reported was reasonable.  The dramatic $6 million upward adjustment to the Accrued Claims Payable that the Company reported in its 10-K annual report for fiscal year 2000, based on no new facts or information, demonstrates the Defendants' recklessness.  Either Defendants behaved recklessly by failing to check, or cause the Company to check, that its accrued liability matched its anticipated expenses;

38

or, assuming the Company did conduct periodic checks, Defendants' recklessly disregarded that

the Company grossly under-estimated its true liability when it did so.

## Materially False and Misleading Statements and Omissions Regarding Safety and Training for Drivers

115.    Simon Transportation made the following materially false and misleading

statements regarding the Company's safety and training policies:

116.    On October 15, 1998, Defendants publicly disseminated a press release that

announced the Company's fourth quarter 1998 fiscal year results.  In that press release the

Company also touted its safety program.  The press release stated in pertinent part:

> Accident claims were another area of concern earlier in the year. Insurance and claims
> expense had been approximately 2.1% and 2.2% of revenue in fiscal 1996 and 1997,
> respectively.  An unusual occurrence of severe accidents in the second quarter of fiscal
> 1998 inflated these expenses to 4.1 % of revenue for the quarter.  We focused on safety
> issues, strengthened our safety program, and appointed a new safety director.  Insurance
> and claims expense has improved to 2.5% of revenue in the third quarter and 2.1% of
> revenue for the fourth quarter.

117.    In the Company's Fiscal 1998 Form 10-K, filed with the SEC on November 13,

1998, the Company stated:

> Simon Transportation emphasizes safety in all aspects of its operations.  Its safety
> program includes: (i) initial orientation, (ii) a four-week to eight-week, on-the-road
> training program; and (iii) 100% log monitoring; and (iv) progressive penalties for
> excessive speed.  The Company has earned the highest DOT safety and fitness rating of
> "satisfactory," which most recently was extended on June 7, 1995.

118.    In the Company's Fiscal 1999 Form 10-K, filed with the SEC on December 14,

1999 the Company stated:

> Simon Transportation emphasizes safety in all aspects of its operations.  Its safety program includes: (i) initial orientation, (ii) a three-week to six-week, on-the-road training program; and (iii) progressive penalties for excessive speed and log violations. The Company has earned the highest DOT safety and fitness rating of "satisfactory," which most recently was extended on November 1, 1999.

119.   In the Company's Fiscal 2000 Form 10-K, filed with the SEC on January 12, 2001, the Company stated:

> Simon Transportation emphasizes safety in all aspects of its operations.  Its safety program includes: (i) initial orientation, (ii) a three-week to six-week, on-the-road training program; and (iii) progressive penalties for excessive speed and log violations. The Company has earned the highest DOT safety and fitness rating of "satisfactory," which most recently was extended on July 6, 2000.

120.   Defendants recklessly disregarded that the foregoing statements were materially false and misleading as alleged in ¶¶ 56-67, because, contrary to these representations, the Company did not adequately emphasize safety in all aspects of its operations.  Furthermore, the Company did not provide an on-the-road training program that lasted a minimum of three weeks. This is evidenced by the fact that Michael Bowers, the Simon Transportation driver who crashed his truck into the California state Capitol Building, only received, by the Company's own admission, a maximum of thirteen days of on-the-road training.  Additionally, former Simon Transportation employee Paula Gifford stated to the <u>Sacramento Bee</u> that the Company would often terminate a driver one week for poor driving habits, and then rehire that same driver the next week when it ran short of drivers.  Moreover, a former Simon Transportation driver trainer, Glenn Horn, stated to the <u>Sacramento Bee</u>, that the Company would hire drivers whom their trainers believed were unqualified.  This included Bowers, whom Horn recommended to the Company should be terminated after performing terribly in his training course.

40

121.    Defendant's scienter is evidenced by the fact that, as senior officers and directors of the Company, they were ultimately responsible for establishing the Company's safety and training policies.  Additionally, Defendants were responsible for establishing the Company's policy and guidelines concerning employee hiring.   Thus Defendants were aware of the length of the Company's driver training, and thus were aware that the actual length of its training program was less than what the Company represented in its SEC filings.  Additionally, Defendants were aware that the Company often rehired drivers shortly after it had previously terminated them for poor driving habits and hired drivers despite recommendations from their trainers that they not be hired.  As a result Defendants recklessly disregarded that its statements concerning the Company's emphasis on safety and on the length of its training program were materially false and misleading.

122.    Defendants' scienter is further evidenced by the fact that they were motivated to compromise the Company's stated safety and training policies due to a lack of qualified drivers in the trucking industry.  The driver shortage during the class period was estimated to be about 80,000 drivers.   As a result the Company shortened its training program and compromised safety in order to get drivers on the road as soon as possible so that the Company could keep its trucks moving.

**Materially False and Misleading Statements and Material Omissions Regarding the Lease Guarantees**

123.    The following statements were materially false and misleading when made, and were made with scienter as set forth in ¶¶ 130-132 below.

41

124.    In Simon Transportation's Form 10-K annual report for fiscal year 1998 filed on November 13, 1998, the Company discussed it lease obligations but omitted to disclose the $126.1 million in residual lease guarantees.  The filing stated:

> The Company is committed under noncancelable operating leases involving certain revenue equipment.  Rent expense for noncancelable  operating leases was $25,343,111, $15,595,123, and $3,997,352 for fiscal years 1998, 1997, and 1996, respectively. Aggregate future lease commitments are $28,364,459,  $20,452,949, $13,581,485, $6,811,800, and $1,883,456 for the years ending September 30, 1999, 2000, 2001, 2002, and 2003, respectively.

125.    Similarly, the Company's 10-Q quarterly financial reports filed with the SEC for the fiscal first quarter 1999, second quarter 1999, and third quarter 1999 recklessly omitted to disclose the Company's $125.1 million residual lease guarantee liability.

126.    Again, in Simon Transportation's Form 10-K annual report for fiscal year 1999 filed on December 14, 1999, the Company discussed it lease obligations but omitted to disclose the $126.1 million in residual lease guarantees.  The filing stated::

> The Company is committed under noncancelable operating leases involving certain revenue equipment.  Rent expense for noncancelable  operating leases was $31,767,339, $25,343,111, and $15,595,123 for fiscal years 1999, 1998, and 1997, respectively. Aggregate future lease commitments are $26,360,171,  $19,488,708, $9,495,805, $2,176,144, and $183,239 for the years ending  September 30, 2000, 2001, 2002, 2003, and 2004, respectively

127.    Similarly, the Company's 10-Q quarterly financial reports filed with the SEC for the fiscal first quarter 2000, second quarter 2000, and third quarter 2000 recklessly failed to disclose the Company's $125.1 million residual lease guarantee liability.

128.    Once again, in Simon Transportation's Form 10-K annual report for fiscal year 2000 filed on January 12, 2001, the Company discussed it lease obligations but omitted to

disclose the $126.1 million in residual lease guarantees. The filing stated:

> The Company is committed under noncancelable operating leases involving certain revenue equipment. Rent expense for noncancelable operating leases was $35,261,458, $31,767,339 and $25,343,111 for fiscal years 2000, 1999 and 1998, respectively. Aggregate future lease commitments are $35,096,831, $24,871,158, $11,349,895, $1,946,816, and $837,049 for the years ending September 30, 2001, 2002, 2003, 2004, and 2005, respectively.

129.    Similarly, the Company's 10-Q quarterly financial reports filed with the SEC for the fiscal first quarter 2001, second quarter 2001, third quarter 2001 recklessly omitted to disclose the Company's $125.1 million residual lease guarantee liability.

130.    Defendants recklessly disregarded that the preceding statements were materially false and misleading because they failed to disclose that the Company had guaranteed a substantial portion of the residual value of all its leased tractors and trailers to its lessors, as alleged in ¶¶ 68-91. Furthermore, the existence of the guarantees were not disclosed in any other portion of the filings. Nor did the Form 10-Q quarterly reports filed for the first, second, and third quarters of fiscal years 1999, 2000, and 2001 disclose the existence of the guarantees.

131.    The Company had guarantees totaling over $125 million as admitted in its Form 10-K for fiscal 2001 filed January 14, 2002. The Company, acting through Defendants, failed to disclose these guarantees, even though the Company was required to disclose their existence under GAAP.   Furthermore, the Company, acting through Defendants, failed to disclose the existence of these guarantees even though they were aware that there was a certainly reasonable possibility that the Company would actually have to pay on these guarantees, as alleged in ¶¶ 68-91.

132.    Defendants' recklessness is also evidenced by the fact that Defendants obviously were aware of these guarantees, as both Defendants Simon and Lang executed lease agreements that were operative during the class period and contained the residual lease guarantees. Yet, Defendants still failed to disclose of the existence of the guarantees in violation of a clearly stated GAAP requirement. GAAP requires disclosure such guarantees even when the risk of payment on the guarantees is remote. Furthermore Defendants were aware, as demonstrated in the Company's SEC filings, that the market for resale equipment had been in decline since 1998 and were aware, or recklessly disregarded, that the decline in the resale market increased the possibility that it would have losses on its guarantees. By failing to disclose the existence of the guarantees, Defendants recklessly disregarded that the Company's SEC filings were materially false and misleading. In addition, Defendants were motivated not to disclose the existence of these guarantees or recognize any liability therefrom, because the Company's debt agreements made it subject to various restrictive covenants including maximum debts tangible net worth and minimum tangible net worth requirements. (See Form 10-K filings for Fiscal years 1998-2001).

## DEFENDANTS' MANIPULATION OF THEIR FINANCIAL STATEMENTS

133.    In order to artificially inflate the price of Simon Transportation's stock, Defendants caused the Company to falsely report its financial results and manipulate its Operating Ratio during the class period. Defendants did this by, inter alia, failing to report the Company's true expenses for accident liabilities and the increased risk of accidents due to the abandonment of prudent and published safety and training procedures, which led to a material overstatement of earnings and earnings per share during the class period.

44

134.    Reporting financial results which were materially overstated, Simon Transportation was able to meet its own and analysts' forecasts for EPS growth.

135.    The false financial results complained of herein were disseminated to the investing community in the form of press releases and included in submissions to the SEC on Forms 10-Q and 10-K.  The Form 10-Q's, signed by defendant Lang, additionally represented that the accompanying financial statements included all adjustments "necessary for a fair presentation of the financial condition and results for the interim periods."

136.    Defendants' representations regarding Simon Transportation's financial results during the class period were false and misleading when made, and were not a "fair presentation" of Simon Transportation's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

137.    GAAP are those principles recognized by the accounting profession as the rules, conventions and practices recognized and employed by the accounting profession for the preparation of financial statements.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) requires that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  The Financial Accounting Standards Board ("FASB") in its Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements in Business Enterprises, in paragraph 86, states that:

> Consumption of economic benefits during a period may be recognized either
> directly or by relating it to revenues recognized during the period [APB Opinion

29]:

1.  Some expenses, such as cost of goods sold are matched with revenues --
    they are recognized upon recognition of revenues that result directly and
    jointly from the same transactions or other events as the expenses.

138.   GAAP requires that a business enterprise match the appropriate expenses in the

period in which the revenue related to those expenses is recorded.  FASB Statement of Concepts

No. 6 states in paragraph 145:

Accrual accounting used as accrual, deferral and allocation procedures whose goal
is to relate revenues, expenses, gains, and losses to periods to reflect an entity's
performance during a period instead of merely listing its cash receipts and outlays.
Thus, recognition of revenues, expenses, gains, and losses and the related
increments or decrements in assets and liabilities -- including matching of cost
and revenues, allocation, and amortization -- is the essence of using accrual
accounting to measure performance of entities.

139.   The goal of accrual accounting is to recognize the effects of transactions and other

events on the financial condition of the enterprise in the appropriate periods in which they occur.

Matching costs and revenues should be simultaneous in the various periods to jointly reflect the

economic benefit or decrement of the transactions or other events occurring in the enterprise.

140.   Defendants caused Simon Transportation to falsify its reported financial results by

failing to accrue and expense, in the proper period, adequate levels of reserves associated with

accidents, instead concealing and deferring such amounts until they could no longer be

concealed.

141.   Pursuant to GAAP, Simon Transportation should have appropriately matched all

of the aforementioned expenses in the same periods as the associated revenues were incurred

throughout the class period.  This would have produced lower, but accurate, earnings figures and

46

would have prevented investors from relying on the misleading financial figures disseminated publicly by Simon Transportation. Instead, Simon Transportation failed to adequately accrue or expense these costs and deferred them until the Company could no longer hide them.

142. FASB Statement of Concepts No. 5, Accounting for Contingencies, requires that when a loss (or an expense) is both probable and subject to estimation, that the liability should be recorded in the financial statements in the period when the loss/liability is determined. FASB Statement of Concepts No. 5 ("FAS 5") ¶ 8 states:

A. An estimated loss from a loss contingency shall be accrued by a charge to income if <u>both</u> of the following conditions are met:

    a. Information available prior to the issuance of the financial statement indicates that it is probable that an asset has been impaired or a liability has been incurred; and

    b. The amount of the loss can be reasonably estimated.

B. FAS 5, ¶ 10 states:

If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, <u>disclosure of the contingency shall be made</u> when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made ... (Emphasis added).

143. Due to these accounting improprieties, Simon Transportation presented its financial results and statements in a manner which violated GAAP, and hence Regulation S-X, including violating the following fundamental accounting principles:

    1. The principle that financial reporting should provide information that is

useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

      2.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

      3.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stock-holders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wide responsibilities for accountability to prospective investors and to the public in general (FASB Statement Concepts No. 1, ¶50);

      4.    The principle that financial reporting should provide information about an enterprise's financial performance during a certain time period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

      5.    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. ¶¶58-59);

6. The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79);

7. The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97); and

144. The undisclosed adverse information concealed by Defendants during the class period is the type of information which, because of SEC regulations, NASDAQ regulations and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be, and must be, disclosed.

## DEFENDANTS' SCIENTER

145. In addition to the substantial evidence of scienter alleged herein and throughout, Defendants' false representations and material omissions were made with scienter in that Defendants (1) recklessly disregarded that the public documents and statements issued or disseminated by Simon Transportation were materially false and misleading as described above; (2) were reckless in not knowing that the false financial results would be issued or disseminated to the investing public; and (3) knowingly and substantially participated in the preparation and/or issuance or dissemination of such statements or documents during the class period.

146.   Each Defendant was aware of the existence of the residual value guarantees that were present in the Company's lease agreements that were operative in the class period.   This is evidenced by the fact, among others, that Defendants executed lease agreements that contained these guarantees.   For example, a review of the bankruptcy record reveals that Defendant Simon executed lease agreements that contained these guarantees with CoreStates Leasing Inc, in 1997 and 1998; First Union Commercial Corp. in 1993; NationsBanc Leasing Corp. in 1993; and Fleet Capital Corp. in 1997.   Defendant Lang executed lease agreements that contained these guarantees with CoreStates Leasing in 1997 and 1998; BancBoston Leasing Inc. in 1996; and TBCC Funding Trust in 2000.

147.   During the class period, each Defendant was provided with copies of Simon Transportation's management reports, press releases and SEC filings alleged herein to be misleading prior to, or shortly after issuance.   Each Defendant, moreover, had the ability and opportunity to prevent issuance of the materially misleading press releases and/or SEC filings, or cause them to be corrected.   As a result, each Defendant is responsible for the accuracy of the public reports and releases detailed herein as "group published" information and are therefore responsible and liable for the representations contained therein.

148.   Defendants are liable, jointly and severally, as direct participants in the wrongs complained of herein.   Defendants had a duty to promptly disseminate accurate and truthful information with respect to Simon Transportation's operations, financial condition and future business prospects or to cause and direct that such information be disseminated so that the market price of Simon Transportation stock would be based on truthful and accurate information.

50

149.   Each Defendant further had the requisite motive and opportunity to commit the acts alleged herein.  By virtue of their positions with Simon Transportation and because of the significant reputational and monetary benefits they stood to gain from a positive public perception of Simon Transportation, and as a result of artificially inflated stock prices, Defendants had both the motive and opportunity to commit the acts alleged herein.

150.   Each Defendant also had the opportunity to commit and participate in the misrepresentations.  Each Defendant was a senior officer or director of Simon Transportation, and controlled press releases, corporate reports, communications with analysts, public filings, and the reporting of the Company's financial information.  The Defendants thus controlled public dissemination of Simon Transportation's false and misleading statements to the investing public, as alleged herein, which misleading statements operated to artificially inflate the price of Simon Transportation's stock during the class period.

151.   Moreover, defendant Simon was motivated to inflate the Company's stock price as the founder and Chairman of the Board of Simon Transportation, in light of the fact that from August 1999 September 2000, Moyes had been negotiating with defendant Simon to acquire control of the Company.  Defendant Simon was motivated to artificially inflate the price of the Company's stock in order to maximize his bargaining position in negotiations with Moyes. Ultimately, defendant Simon was able to sell all 913,751 of his B class shares to Moyes for $8.2 million on September 19, 2000.

152.   Defendant Lang was motivated to inflate the Company's stock price due to the fact that he held 185,000/15,000 (stock options/SARs) to buy the Company's stock.  Thus,

Defendant Lang was motivated to artificially inflate the price of the Company's stock above the

exercise price of his options that way he could reap a profit on his options.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

153.    The market for Simon Transportation's securities was open, well-developed and

efficient at all relevant times.  As a result of these materially false and misleading statements and

failures to disclose the full truth about Simon Transportation's accident related costs, earnings,

and operating ratio, the Company's common stock traded at artificially inflated prices during the

entire class period.  Plaintiff and other members of the Class purchased or otherwise acquired

Simon Transportation stock relying upon the integrity of the market price of Simon

Transportation stock and market information relating to Simon Transportation, or, upon

Defendants' false and misleading statements, and in ignorance of the adverse, undisclosed

information that Defendants recklessly disregarded.  As a result Plaintiff and other members of

the Class have been damaged thereby.

154.    In connection with the claims under Section 10(b) of the Exchange Act and Rule

10b-5 thereunder, Plaintiff will rely, in part, upon the presumption of reliance established by the

fraud-on-the-market doctrine.  The market for Simon Transportation's common stock was at all

times an efficient market for the following reasons, among others:

1.    As a regulated issuer, Simon Transportation filed periodic public reports

with the SEC;

2.    The common shares of Simon Transportation were traded throughout the

class period on the NASDAQ National Market, which is a well-developed and efficient market;

        3.     Simon Transportation disseminated information on a market-wide basis over various electronic media services such as the Bloomberg news wires;

        4.     The market price of Simon Transportation's securities reacted efficiently to new information entering the market; and

        5.     During the class period, Simon Transportation was covered by a number of analysts.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

155.    The statutory safe harbor relating to forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements pleaded herein are not "forward-looking statements." To the extent there were any forward looking statements, they were not identified as such, nor was there any meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Simon Transportation who knew that those statements were false when made.

156.    Any warnings contained in the press releases and the financial statements quoted

53

herein were generic statements of the kind of risks that affect any transportation company and misleadingly contained no specific factual disclosure of any specific problems with Simon Transportation which placed the Company's profitability and growth at risk.

## COUNT I

### VIOLATIONS OF §11 OF THE SECURITIES ACT AGAINST ALL DEFENDANTS

157.    Plaintiff  repeats and re-alleges the allegations as set forth above, except to the extent any paragraph alleges that Defendants misconduct was intentional, knowing or with a reckless disregard for the truth, or otherwise sounds in fraud.

158.    This claim is brought by Plaintiff Turner on behalf of himself and other class members who acquired shares of the Company's stock pursuant to the Registration Statements, and documents incorporated therein (which included SEC quarterly and annual filings that were filed after the effective date of the Registration Statement.), that were filed by the Company on January 6, 1998 and December 16, 1999 as part of the Company's employee stock ownership plan.  The Registration Statements were executed by Defendants.

159.    Upon information and belief, this claim is also brought by Plaintiffs McQuarrie and Turner and other class members who acquired shares of the Company's stock pursuant to the Registration Statements and documents incorporated therein (which upon information and belief included SEC quarterly and annual filings that were filed after the effective date of the Registration Statements), that the Company filed in order to offer the Company's stock to its employees pursuant to the Company's  401(K) benefits plan and employee stock ownership plan.

Upon information and belief the Registration Statement was filed in 1995 and was signed by Defendants.

160.    Defendants as officers and directors of Simon Transportation, owed to the members of the class who acquired stock as part of the employee benefit plan the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements and the documents incorporated therein, at the time they became effective and the incorporated documents were issued.  The duty to make a diligent investigation was to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statements and the documents incorporated therein, as set forth herein.  As such, Defendants are liable to members of the class who acquired their shares pursuant to the Registration statements and the documents incorporated therein.

161.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements, and the documents incorporated therein, were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

162.    Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, materially false and misleading written statements to the investing public which were contained in the Registration Statements and documents incorporated therein, which misrepresented or failed to disclose, inter alia, the facts

55

set forth above.  By reason of the conduct herein alleged, each Defendant violated §11 of the

Securities Act of 1933.

163.    As a direct and proximate result of Defendants' acts and omissions in violation of

the Securities Act, the market price of the Company's stock was artificially inflated during the

class period and members of the class suffered substantial damage in connection with their

acquisition of Simon Transportation's common stock pursuant to the Registration Statements and

documents incorporated therein.

164.    At the times they acquired their shares, members of the class who acquired such

shares were without knowledge of the facts concerning the false or misleading statements or

omissions alleged herein.

165.    Less than one year elapsed from the time that Plaintiff discovered or reasonably

could have discovered the facts upon which this action is based, to the time that Plaintiff filed his

initial complaint.  Less than three years have elapsed from the time that the securities upon which

this claim is brought were offered to the time Class Representative filed this action.

## COUNT II

### VIOLATION OF § 15 OF THE SECURITIES ACT<br>AGAINST ALL DEFENDANTS

166.    Plaintiff repeats and re-alleges each and every allegation contained above as if

alleged in full herein, except for any allegations above that contain facts necessary to prove any

elements not required to state a Section 15 claim, including without limitation, allegations that

Defendants misconduct was intentional, knowing or with a reckless disregard for the truth, or

otherwise sounds in fraud.  This Count is brought pursuant to Section 15 of the Securities Act, 15

U.S.C. § 77o, on behalf of the Plaintiff and the Class, against Defendants.

167.   As alleged above, Defendants violated Section 15 of the Securities Act.  At the

time the Registration Statements and documents incorporated therein, were issued or

disseminated, Defendants were each control persons of Simon Transportation within the meaning

of Section 15 of the Securities Act, by virtue of their positions as senior officers, directors, and/or

substantial shareholders of the Company.

168.   Defendants had the power and influence and exercised the same to cause the

Company to engage in the illegal conduct and practices complained of herein by causing the

Company to disseminate the false and misleading information referred to above.

169.   By virtue of the conduct alleged in Count I, Defendants are liable for the aforesaid

wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## COUNT III

## VIOLATIONS OF §10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

170.   Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

171.   At all relevant times, Defendants, individually and in concert, directly and

indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct whereby they knowingly and/or

recklessly made and/or failed to correct public representations which were or had become

materially false and misleading regarding Simon Transportation's financial results and operations. This continuous course of conduct resulted in the Defendants causing Simon Transportation to publish public statements which they knew, or were reckless in not knowing, were materially false and misleading, in order to artificially inflate the market price of Simon Transportation stock and which operated as a fraud and deceit upon members of the Class.

172.   Defendants are liable as direct participants in and as controlling persons of the wrongs complained of herein. By virtue of their positions of control and authority as officers and directors of Simon Transportation, Defendants were able to and did, directly or indirectly, control the content of the aforesaid statements relating to the Company, and/or the failure to correct those statements in a timely fashion once they knew or were reckless in not knowing that those statements were no longer true or accurate. The Defendants caused or controlled the preparation and/or issuance of public statements and the failure to correct such public statements containing misstatements and omissions of material facts as alleged herein.

173.   The Defendants had actual knowledge of the facts making the material statements false and misleading, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though same were available to them.

174.   In ignorance of the adverse facts concerning Simon Transportation's business operations and earnings, and in reliance on the integrity of the market, Plaintiff and the Class acquired Simon Transportation common stock at artificially inflated prices and were damaged thereby.

175.   Had Plaintiff and the Class known of the materially adverse information not

disclosed by Defendants, they would not have purchased Simon Transportation common stock, or at least not at the inflated prices paid.

176.     By virtue of the foregoing, defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

## COUNT IV

## VIOLATION OF §20(a) OF THE EXCHANGE ACT
## AGAINST ALL DEFENDANTS

177.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

178.     This count is asserted against Defendants and is based upon Section 20(a) of the 1934 Act.

179.     The Defendants, by virtue of their offices, directorships, stock ownership and specific acts were, at the time of the wrongs alleged herein and as set forth in Count III, controlling persons of Simon Transportation within the meaning of Section 20(a) of the 1934 Act.  The Defendants had the power and influence and exercised the same to cause Simon Transportation to engage in the illegal conduct and practices complained of herein by causing the Company to disseminate the false and misleading information referred to above.  Moreover, Defendants owned or controlled substantial amounts of the Company's stock.

180.    The Defendants' respective positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

181.    By virtue of the conduct alleged in Count III, the Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment:

1.    Determining that the instant action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

2.    Awarding compensatory damages and/or rescission as appropriate against Defendants, in favor of Plaintiff and all members of the Class for damages sustained as a result of Defendants' wrongdoing;

3.    Awarding Plaintiff and the Class the costs and disbursements of this suit, including reasonable attorneys', accountants' and experts' fees; and

4.    Awarding such other and further relief as the Court may deem just and proper, including imposition of a constructive trust upon the proceeds of Defendants' insider trading, pursuant to Fed. R. Civ. Proc., Rules 64 and 65.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 6, 2004

HENRIKSEN & HENRIKSEN, P.C.

By

C. Richard Henriksen, Jr.
320 South 500 East
Salt Lake City, Utah  84102
Telephone:     (801) 521-4145
Facsimile:      (801) 355-0246

**Plaintiff's Liaison Counsel**

Lionel Z. Glancy
Michael Goldberg
GLANCY & BINKOW LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California  90067
Telephone:     (310) 201-9150
Facsimile:      (310) 201-9160

Kenneth J. Catanzarite
CATANZARITE LAW CORPORATION
2331 W. Lincoln Avenue
Anaheim, California 92801
Telephone:     (714) 520-5544
Facsimile:      (714) 520-0680

Kwasi Asiedu
LAW OFFICES OF KWASI ASIEDU
3858 Carson Street #204
Torrance, California 90503
Telephone:     (310) 792-3948

**Attorneys for Plaintiff**

61

## CERTIFICATE OF MAILING

I hereby certify that on this _6_ day of February, 2004, a true and correct copy of the foregoing **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS,** was mailed, postage prepaid, to the following:

Richard D. Simon
c/o Simon Transportation Services, Inc.
5175 West 2100 South
West Valley City, UT 84120

Alban A. Lang
c/o Simon Transportation Services, Inc.
5175 West 2100 South
West Valley City, UT 84120

Lloyd Winawer
WILSON, SONSINI, GOODRICK & ROSAITI
650 Page Mill Road
Palto Alto, CA  94304

C. Christopher Shoff
WILSON, SONSINI, GOODRICK & ROSAITI
2795 East Cottonwood Pky. #300
Salt Lake City, UT 94121-6928

62